# EXHIBIT 1

**UPMIL 5-6: Winecup Critique Comparison Chart**

- Categories: Winecup's critiques are (i) Plausible; (ii) Debatable; and (iii) Unsupported.
- Cites to UPMIL 5-6 are to "M" for Motion.
- Cites to Winecup's response to UPMIL 5-6 are to "R" for Response.
- Internal citations are omitted when quoting briefs.

**(i)    Winecup's critiques are PLAUSIBLE.**

| UPMIL 5-6 | Response to UPMIL 5-6 | After Review |
|---|---|---|
| "[Godwin] spent the next few years, 2008 to 2012, building residential housing in Tennessee, a job that had 'nothing to do with railroads.'" M at 2. | "Union Pacific claims that Godwin spent 2008 to 2012 building residential housing in Tennessee at a job that had nothing to do with railroads." R at 7.<br><br>Godwin spends less than two hours a month working at Godwin Construction LLC. R at 7. | • Godwin Construction LLC was founded in 2012.<br>• Godwin continued to work for Crouch Engineering through 2013, although the time he spent working Construction vs. Engineering is not clear. 181:22-25 (Godwin works two hours per month <u>now</u> for Godwin Construction; he does not testify he worked that little for the years after he founded the company in 2012).[1] |

---

[1] Both sides were impacted by Godwin's non-responsiveness for some testimony and his incomplete (often misleading) CV. For example, Godwin's CV does not disclose he graduated from college in 2008 but lists what we now understand is <u>pre-graduation</u> "related experience," such as welding. Union Pacific admits the deposition did not fully pin down exactly what Godwin did before 2013, and UPMIL 5-6 made an inference not fully supported by the record at the time. However, Union Pacific was not in a position to obtain a clarifying declaration from Godwin, but Winecup was and did not elect to clarify many points it put at issue. The burden of proof to satisfy Rule 702 remains with Winecup. *See* Fed. R. Evid. 702(a) (expert witness must be qualified by knowledge, skill, experience, training, or education).

(ii) Winecup's critiques are DEBATABLE.

| UPMIL 5-6 | Response to UPMIL 5-6 | After Review |
|---|---|---|
| "At his deposition it became clear that he graduated in 2008 and that many jobs in his C.V. date to before that. . . . he prepared his report and was deposed in this case, relying on what he did in 2013 to 2017." M at 2. | "Godwin testified that between 2005 and 2013 he worked at least 40 hours a week at Crouch Engineering and his CV shows that he was working on railroad engineering and construction projects throughout that time." R at 7. | • Godwin worked for Crouch Engineering through 2013.<br>• He testified he worked 40 hours per week with Crouch Engineering <u>during</u> college (hours counted toward processional licensure). 182:18-25.<br>• Godwin does not state how many hours per week he worked with Crouch Engineering after college or after he started Godwin Construction. |
| "From 2014 to 2017, he worked primarily for one railroad on a new construction project." M at 2. | "Union Pacific claims that from 2014 to 2017 Godwin worked primarily for one railroad on a single new construction project. That is again inaccurate. His list of clients includes over three dozen since he founded Railroad Consultants in 2013." R at 7. | • Godwin provides a list of "RELATED EXPERIENCE" for 2014-2017. CV at 2.<br>• He lists only three projects, <u>all for Norfolk Southern</u>.<br>• Q: "Was [first project on list] new construction?"<br>• A: "Yes, but it was also existing track construction. Replacements of existing structures under track. So it was – it's tricky, yes and no." 174:10-22.<br>• One project [third on list] was new construction. 177:2-3.<br>• Godwin does provide a partial client list, with no project details or dates. |

2

| UPMIL 5-6 | Response to UPMIL 5-6 | After Review |
|---|---|---|
| *See above.* | "Godwin testified that over the past six years he has managed over a billion dollars of railroad construction, including 40 to 50 bridge projects and miles and miles of track." R at 7. | <ul><li>Two of the Norfolk Southern projects listed on Godwin's "RELATED EXPERIENCE" make up half of that billion dollars.</li><li>"Those projects were known as the Piedmont Improvement Program in North Carolina, and the total construction cost was $565 million." 175:10-19.</li></ul> |
| "None of that work in his C.V. was done on an emergency basis." M at 2. | "Union Pacific claims that the work in Godwin's CV was not done on an emergency basis." R at 7. | <ul><li>"<u>I did not put my emergency repair experience in my CV</u> as projects for clients that are four years long and half a billion dollars are more impressive than something that's a million dollars and three weeks long, if that makes sense." 176:3-12.</li><li>*For his undated "EXPERTISE IN THE FIELD OF RAILWAY ENGINEERING & PLANNING" Section . . . "I mean, the emergency repair items would fall under some of these paragraphs, yes, but it is not – there's not a specific section dedicated to emergency repairs, no." 177:4-14.</li></ul> |

**(iii)    Winecup's critiques are UNSUPPORTED.**

| UPMIL 5-6 | Response to UPMIL 5-6 | After Review |
|---|---|---|
| "In Godwin's opinion, he does not make clear the period for which he believes Union Pacific is seeking damages. Union Pacific is only requesting damages for the period *after* Main Line 2 was brought into service (February 21, 2017) and *before* Main Line 1 was brought into service (April 1, 2017). During this period, rerouting costs were caused solely by the remaining three washouts on Main Line 1." M at 4. | "Union Pacific claims that Godwin did not know the time period for which Union Pacific was seeking rerouting damages and he did not know if rerouting costs ended after Main Line 2 was reopened. But Godwin stated that he understood Union Pacific's rerouting costs were calculated through the end of March." R at 8. | • Godwin <u>suggested</u> the end of March ("It appears that rerouting costs . . . are through the end of March") but he was not able to determine if UP incurred rerouting costs after Main Line 2 was back in service: "I cannot answer the question for you until I get more information from Union Pacific." 125:17-126:4.<br>• Winecup does not dispute the accuracy here. Godwin did not know the facts about Main Line 2, but his opinion makes no sense unless it assumes UP's damage request covers the period before Main Line 2 was back in operation. It does not, and this examples shows Godwin opines without knowing all pertinent facts. |
| "At his deposition he claimed to have been 'personally involved in and rerouting' about 12 times, all on tracks east of the Mississippi River. When questioned about the meaning of 'involved,' he explained that he had 'helped' the railroad employees who actually did the rerouting: 'you know, *they ultimately decide* where traffic's rerouted, but *we provide information to them from the field*' and 'we provide the information for them to plug in their model.'" M at 3. | "Union Pacific also attempts to downplay Godwin's rerouting experience. But Godwin testified that he had been personally involved with rerouting for a Class 1 railroad approximately twelve times over the past six years. In addition, he has experience with short line railroads." R at 8. | • Godwin's Declaration adds no additional facts: "personally involved in rerouting for a Class 1 railroad approximately 12 times over the past six years, plus [he] has additional experience with short line railroads. Railroads turn to me for professional guidance to implement the best rerouting solutions. I have worked in the railroad industry for 15 years completing the aforementioned tasks." Godwin Decl. ¶ 2. |

4

| UPMIL 5-6 | Response to UPMIL 5-6 | After Review |
|---|---|---|
| "Godwin admitted he needed information on the number of trains Union Pacific ran per day, but he did not have that information." M at 6. | "Union Pacific states that Godwin did not have information on the number of trains Union Pacific ran per day. But Godwin said the records he reviewed showed the demand for trains in the relevant area was typically 13 trains a day and occasionally up to 20 trains a day." R at 8-9. | <ul><li>In response to whether number of trains matters, Godwin admits it does. 113:16-20.</li><li>"The demand was 13 trains a day post flood, I believe, and maybe up to 20 trains a day. But really there wasn't enough information to be clear on what train was – what train symbol was on the section of the track . . . <u>there's just not enough information to tell</u>." 113:4-15.</li></ul> |
| "He did not know if Union Pacific needed permission to access adjacent land to do repair work." M at 6. | "Union Pacific asserted that Godwin did not know if Union Pacific needed permission to access adjacent land to do repair work. Godwin's testimony was that he did 'not know for the washouts unrelated to my expert testimony, but the three washouts that we're talking about, <u>they should have been able to access</u> from public crossings using their own tracks and there would not be a need to get permission from any land owners." R at 9. | <ul><li>Winecup uses an assumption to try and refute a fact.</li><li>Q: "Okay. So you assume that they wouldn't need to [get permission], but you don't actually know what they actually had to do here?"</li><li>A: "Correct." 147:4-7.</li></ul> |

5

| UPMIL 5-6 | Response to UPMIL 5-6 | After Review |
|---|---|---|
| "The maintenance of a bridge exceeds that of a culvert, but Godwin did not consider maintenance costs." M at 8. | "Union Pacific also claims Godwin testified that he did not consider the maintenance costs of a bridge, but the deposition does not say that. Godwin stated only that his definition of a bridge being 'gold-plated' did not include the maintenance needs of a bridge; he did not testify that he did not consider any maintenance costs. Indeed, Godwin testified that future maintenance is something to consider and the 'maintenance cost of a bridge is higher over time than a culvert.'" R at 10-11. | <ul><li>No testimony that Godwin considered maintenance costs other than his general statement that bridge maintenance costs are higher than culvert maintenance.</li><li>He calls UP's repairs "gold plated" and concedes that definition has nothing to do with maintenance. 59:13-22.</li><li>The point here is that UP took on additional future expense (for which it is not seeking to recover), which tends to prove its decision-makers genuinely thought a bridge was overall the least expensive alternative. The decision-makers intentionally incurred un-reimbursable costs to build bridges, which disproves innuendos that UP was seeking to profit from its bridge decisions (*e.g.*, "gold-plated repairs").</li><li>This goes directly to the legal issue discussed in the brief that UP can replace the destroyed embankments with what is a reasonable replacement chosen at the time and at the place where the replacement must be built.</li></ul> |

| UPMIL 5-6 | Response to UPMIL 5-6 | After Review |
|---|---|---|
| "He used the RS Means tool for national, not regional costs. Regional averages are available, but he did not consult them. He decided at his deposition he needs to 'get back' to Plaintiff on those." M at 8. | "Union Pacific also criticizes Godwin for using the national average of costs from RS Means instead of regional costs. That argument misstates the testimony. Godwin testified that the nationwide data he used from RS Means are the industry standard, are very accurate, that RS Means does have costs adjustments to increase the price for cities like New York, and that if there were an adjustment for rural areas, it would be less, not more." R at 11. | • It is not categorically true that "if there were an adjustment for rural areas, it would be less, not more." R at 11.<br>• "Typically, in rural settings like we have here the costs are much less because labor's less. Yes, sometimes you have a little more shipping for materials, but most of the materials should have been shipped by rail, so we usually come up with very good estimates." 150:14-19.<br>• In response to whether RS Means provides for regional variation, "I have to research that and get back to you. I do know they have adjustments . . . but the nationwide cost is just an accepted average to use nationwide." 152:14-153:4.<br>• *UP argues regional variations are available. Godwin confirms city variations are available but not necessarily regional variations. 153:5-9. Winecup does not address this distinction. |
| "Godwin also did not have enough information to calculate culvert costs, another reason Godwin could not know whether bridges would be more expensive." M at 8. | "Union Pacific claims that Godwin did not have enough information to calculate culvert costs. But Godwin did have enough information to calculate culvert costs, as shown in the detailed calculation of culvert costs included in his report." R at 11. | • UP breaks down this argument into specific categories: fill, roads/trucks, pipes, timing, and Winecup's lack of decisions.<br>• All are sound and discussed below. |

7

| UPMIL 5-6 | Response to UPMIL 5-6 | After Review |
|---|---|---|
| "At his deposition, he admitted for 165 pages that he did not know a great deal about those costs (detailed below). After these 165 pages of admissions, he admitted his statements that bridges cost substantially more than culverts were the result of 'just shooting—throwing an arrow at a dart board with my eyes closed.' He could not 'have a full opinion about that' given his lack of knowledge of the facts." M at 7. | "Union Pacific claims that Godwin 'admitted for 165 pages that he did not know a great deal about those costs.' Union Pacific attempts to support that misstatement with an out-of-context quote from Godwin that he was 'throwing an arrow at a dart board with [his] eyes closed.' But Union Pacific knows that the quote they cite has nothing to do with the cost of steel bridges versus earthen embankments. As the context of the questioning in his deposition clearly shows, Godwin was referring to Union Pacific's inquiry about the cost of Union Pacific's bridges versus other bridges, a calculation that Godwin had not made." R at 9. | <ul><li>*See* footnote.[2]</li><li>Q: "But you have no doubt that Union Pacific's bridges cost more than they should have, you're just not sure exactly how much more?"</li><li>A: "Yes, that would be a fair statement." 165:13-16.</li><li>The "dart board" quotes comes in response to a question about how much more UP spent than it needed to.</li><li>His opinion: "the structures that were rebuilt were <u>much more expensive and time consuming</u> than replacing the structures in-kind and providing fill for each location." TX204.</li></ul> |

---

[2] Union Pacific's quoted language was based on its understanding that Godwin opined that bridges were unreasonably costly since, when Union Pacific was making decisions from February 8-15, 2017 after the flood, a diligent railroad should have decided to use culverts and not bridges under the circumstances. As Union Pacific's reply explains, this is an incorrect statement of the law. Accordingly, if Godwin's opinion is interpreted as addressing only the issue identified by Winecup, it is not relevant to the correct legal issue and should be excluded on that basis.

If Godwin's opinion is interpreted as we did, it is relevant and thus potentially admissible, but then its admissibility depends on whether Godwin had the facts necessary to opine on the relevant issue: from February 8-15, 2017, when the decisions had to be made, whether those making them for the railroad were reasonable in deciding that building bridges was preferable or at least equal to using culverts as a way to put the railroad into the condition it would have been in had the Winecup dams been properly maintained. The relevant pre-flood condition, that the railroad could run Main Line 1 normally, was the premise in UPMIL 5-6. If Winecup's interpretation of Godwin's opinion is adopted, those motion should be granted since his opinion is irrelevant. If Union Pacific's interpretation is adopted, the issue UPMIL 5-6 raises, as modified (slightly) by this chart, is the more fact-intensive one of whether Winecup met its burden of showing that Godwin considered sufficient facts to support the relevant opinion.

| UPMIL 5-6 | Response to UPMIL 5-6 | After Review |
|---|---|---|
| Eight bullet points describe information Godwin lacked about whether native soils could be used, UP's fill specifications, availability of fill in the area, and source or location from which fill would need to be shipped. M at 12. | "Union Pacific also claims that the fill required for embankments was not available. But that fact is disputed. As Godwin testified, he has never seen a railroad run out of fill. If necessary, fill can be shipped from quarries three or four states away. This is supported by testimony from a Union Pacific employee, who stated he did not have a shortage of fill for the repairs between mile post 670 and 679. Deposition of James Hill, 134:7-19, attached as Exhibit 4." R at 11. | <ul><li>No incorrect assertion here.</li><li>UP's point is about getting the fill to the sites.</li><li>Godwin claims UP had enough rock but did not know what the source of that rock would be: "It would be a quarry somewhere, but I do not know that information." 63:5-9.</li><li>Hill says he had sufficient fill but he could <u>not</u> get it to the site: "Could I get the fill to the railroad, I couldn't." Winecup Ex. 4 at 134:18-19.</li></ul> |
| "Godwin did not know whether local, native soils could be used as fill." M at 12. | "Union Pacific claims that Godwin did not know whether local soils could be used as fill. But Godwin's calculations assumed that all fill material would be brought in by train and did not depend on the use of local soils. If local soils could be used, that would only further reduce the cost." R at 11-12. | <ul><li>No incorrect assertion here.</li><li>In response to whether he knew if native soils were available, "I would have to – have to visit that look at that in more detail . . . I do not know in this particular situation." 63:10-20</li><li>This is not an "incorrect assertion." This is an argument about whether native soils matter in this context.</li><li>Assuming fill material can be brought in <u>by train</u> is problematic.</li></ul> |

9

| UPMIL 5-6 | Response to UPMIL 5-6 | After Review |
|---|---|---|
| "He did not know Union Pacific's specifications for fill, though he assumed rock was acceptable." M at 12. | "Union Pacific also claims that Godwin did not know Union Pacific's specifications for fill. Again, the deposition does not support this assertion. Godwin testified that 'there are fill requirements within all railroad specifications that dictate what kind of fill can be used[,] but rock is always an acceptable fill material.' Godwin also testified that quarries could satisfy whatever requirements for rock were necessary." R at 11-12. | <ul><li>No incorrect assertion here.</li><li>When asked about UP's fill specifications: "There are fill requirements within all railroad specifications that dictate what kind of fill can be used. But rock is always an acceptable fill material." 64:10-21.</li></ul> |
| "Godwin did not include anything in his damages calculation for building roads." M at 12. | "Union Pacific states that Godwin did not include a calculation for building roads. But Godwin testified that he did not include the cost of building access roads because the site had access by rail and nearby road crossings." R at 12. | <ul><li>No incorrect assertion here.</li><li>Winecup's brief concedes Godwin did not include costs of building roads. R at 12.</li></ul> |
| "Godwin did not know if culvert pipes were available in inventory or if they had to be specially ordered. Godwin did not know if Union Pacific guidelines permitted the use of the 14-15 foot Corrugated Metal Pipes (CMP) Godwin suggested. In fact, Union Pacific typically did not use CMP culverts larger than six feet." M at 12. | "Union Pacific stated that Godwin did not know if culvert pipes were available. But Godwin testified that culvert pipes <u>are generally available</u> across the nation and even if it were necessary to ship from Pennsylvania (for example) and pay a couple thousand dollars more to ship, there is always pipe available to purchase. He also testified that whether two smaller pipes are used or one larger pipe, the difference in cost is negligible, and if larger pipes were not available, multiple smaller pipes could be used. Likewise, the cost difference between different types of pipes—such as structural plate pipe and corrugated metal pipe—is also negligible, as the cost of the steel determines the price." R at 12. | <ul><li>Godwin did not know whether 15- or 14- foot CMP culvert pipe were available but says these pipes "could have easily been replaced with something smaller and more than one pipe." 72:19-24.</li><li>"I do not know [if a 14- or 15- foot culvert was available], but if they were not available, I would have gone to the next – the larger size available that's under that and put in enough pipes to carry the flood capacity." 134:11-17.</li></ul> |

| UPMIL 5-6 | Response to UPMIL 5-6 | After Review |
|---|---|---|
| "Godwin thought workers could start building culverts faster than they could put in a bridge, but the opposite was true." M at 13-14. | "Union Pacific's section on 'timing' consists mostly of citations to a declaration from its internal expert as to why Union Pacific chose to build bridges instead of embankments with culverts. That is <u>not relevant to Godwin's opinion</u>. Union Pacific tries to make much of the fact that Godwin did not know at the time of his deposition when flood waters had receded enough to begin construction work. But that is <u>not material</u> to Godwin's opinion because, as he testified, construction of a bridge would need to wait just as long for water to recede as construction of an embankment with culverts." R at 12. | • Winecup does not claim UP's assertions are incorrect, only irrelevant.<br>• Winecup's label of "irrelevant" is only accurate if Winecup is allowed to change Godwin's opinion as discussed in the brief.<br>• Rebuilding speed is relevant if Godwin must stick to his original opinion on reasonableness. Godwin's lack of knowledge as to facts he needed to know goes to the admissibility of his opinion (*e.g.*, how fast railroad could resume operation with bridges vs. culverts; financial loss caused by delay; and whether decisions about decommissioning one or both dams made bridges more appropriate).<br>• UP engineers standing in the mud during the February 2017 storm were reasonable to take such factors into account, and Godwin cannot condemn those decisions while ignorant of the relevant facts. |
| "Godwin did not know when Union Pacific knew if the Winecup dam which had failed was going to be replaced. He did not consider that a factor. If no dams were in place, that required more flow-through capacity under the tracks, which made bridges more suitable than culverts." M at 14. | "Union Pacific states that Godwin did not know when Union Pacific knew if the dam that failed was going to be replaced and he did not consider that a factor. <u>That is correct but irrelevant</u>. While the existence of an upstream dam might be a factor in Union Pacific's decision about what structure it wanted to build for its own future risk tolerance, it is not relevant to any of Godwin's opinions about construction costs or rerouting." R at 13. | • Winecup does not claim UP's assertions are incorrect, only irrelevant.<br>• *See above.*<br>• Also, "without dams in place, Union Pacific needed more flow-through capacity under the railroad tracks, which also made bridges more suitable than culverts." Gawronski Decl. ¶ 20 (ECF No. 139-3). |