UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

UNION PACIFIC RAILROAD COMPANY, a Delaware corporation,

Plaintiff,

v.

WINECUP RANCH, LLC, an Idaho Limited Liability Company; and WINECUP GAMBLE, INC., a Nevada corporation; and PAUL FIREMAN, an individual,

Defendants.

Case No. 3:17-cv-00477-LRH-CLB

ORDER

Before the court are a total of 27 motions in limine; 21 motions filed by Union Pacific Railroad Company ("Union Pacific") (ECF Nos. 111, 112, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 139, 175, 176 & 193), and 6 motions in limine filed by Winecup Gamble, Inc. ("Winecup") (ECF Nos. 141, 143, 149, 150, 151, 152). The parties timely responded. The Court has fully reviewed the record and considered the parties' oral argument; for the reasons below, the Court grants in part and denies in part these motions.

## I.      BACKGROUND

Union Pacific owns railroad track that runs through 23 Western states, a portion of which runs east/west across the Utah/Nevada state line and through Elko County, Nevada. ECF No. 89 ¶ 1. Winecup owned and managed the Dake Reservoir dam (ID #NV00109, legal description 189DN40 E70 07D) and 23 Mile dam (ID #NV00110, legal description 189CN42 E67 15BA),[1] both located on Thousand Springs Creek, in Elko County, Nevada. *Id.* ¶¶ 2-4. On or about

---

[1] The record indicates that this dam is also known as 21 Mile dam. *See* ECF No. 154-2 at 5.

1  February 8, 2017, the 23 Mile dam overtopped and breached in two locations. *Id.* ¶ 20; ECF No.

2  108 ¶ 19. Union Pacific alleges that as a result of the dam's failure, water flowed downstream, in

3  part, to the Dake Reservoir dam, and that the Dake then eroded and breached, causing flooding

4  and ultimately washing out a significant portion of Union Pacific's railroad tracks.  ECF No. 89

5  ¶¶ 22-24.

6      Union Pacific filed its original complaint on August 10, 2017, against Winecup Gamble,

7  Winecup Ranch, LLC, and Paul Fireman. ECF No. 1. Union Pacific has twice amended its

8  complaint (ECF Nos. 37, 89), to which Winecup has answered (ECF No. 91).[2] Little pre-trial

9  motion practice has occurred in this case other than the 27 pending motions in limine. The Court

10  heard selected oral argument on four of these motions on June 25, 2020 (ECF No. 195), and rules

11  on all now pending.

12  **II.    LEGAL STANDARD**

13      "A motion *in limine* is used to preclude prejudicial or objectionable evidence before it is

14  presented to the jury."  Stephanie Hoit Lee & David N. Finley, *Federal Motions in Limine* § 1:1

15  (2018).  The decision on a motion in limine is consigned to the district court's discretion—

16  including the decision of whether to rule before trial at all.  *See Hawthorne Partners v. AT&T*

17  *Techs., Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993) (noting that a court may wait to resolve the

18  evidentiary issues at trial, where the evidence can be viewed in its "proper context").  Motions in

19  limine should not be used to resolve factual disputes or to weigh evidence, and evidence should

20  not be excluded prior to trial unless the "evidence is clearly inadmissible on all potential grounds."

21  *Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004).  Even then, rulings on

22  these motions are not binding on the court, and the court may change such rulings in response to

23  developments at trial.  *See Luce v. United States*, 469 U.S. 38, 41 (1984).

24      Generally, all relevant evidence is admissible.  FED. R. EVID. 402.  Evidence is relevant if

25  "it has any tendency to make a fact more or less probable than it would be without the evidence."

26  FED. R. EVID. 401.  The determination of whether evidence is relevant to an action or issue is

27

28  [2] Union Pacific's first amended complaint no longer included defendant Winecup Ranch, LLC, and its second amended complaint no longer included Paul Fireman. *See* ECF Nos. 37, 89.

2

expansive and inclusive. *See Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384-87 (2008).   However, the court may exclude otherwise relevant evidence "if its probative value is substantially outweighed by the danger of" unfair prejudice. FED. R. EVID. 403. Further, evidence may be excluded when there is a significant danger that the jury might base its decision on emotion, or when non-party events would distract reasonable jurors from the real issues in a case. *See Tennison v. Circus Circus Enterprises, Inc.*, 244 F.3d 684, 690 (9th Cir. 2001); *United States v. Layton*, 767 F.2d 549, 556 (9th Cir. 1985).

## III.    DISCUSSION

The parties have submitted a total of 27 motions in limine. The Court will address each in turn.

### A.  Union Pacific's Motions in Limine

1. Union Pacific's first motion in limine to exclude meteorological opinions of Matthew Lindon and to appoint a neutral expert (ECF No. 111) and its second motion in limine to exclude hydrological opinions of Matthew Lindon and to appoint a neutral expert (ECF No. 112) are denied.

Union Pacific motions the Court to exclude Winecup's expert, Matthew Lindon, from providing opinions on meteorological and hydrological issues. ECF 111 at 3. Importantly, the parties dispute whether the February 2017 storm was greater or less than a 100-year storm event— Union Pacific's expert concluded that the storm event did not exceed the 100-year event, while Winecup's expert, Lindon, concluded that it did. In its first motion, Union Pacific argues that Lindon is not qualified to opine on meteorology because he does not hold a degree or certification in the field and his opinion should be excluded because he did not reliably apply accepted methodology to sufficient facts. ECF No. 111. In its second motion, though Union Pacific concedes that Lindon is qualified to opine on hydrology, it argues that his opinions should be excluded because his methodology and data were flawed. ECF No. 112. Additionally, Union Pacific requests the Court appoint a neutral expert to be either a technical advisor to the Court or expert witness. ECF Nos. 111 & 112. Winecup argues that Lindon is qualified to opine on both meteorological and hydrological issues, and that Union Pacific's arguments do not go toward the admissibility of Lindon's opinions, but only the weight, and amount to nothing more than a "battle

of the experts." ECF No. 120. Winecup further argues that neither a *Daubert* hearing nor a neutral expert are necessary. *Id.*

       i.   *The Court will not appoint a neutral expert*

   Union Pacific requests the Court appoint a neutral expert to help the Court "understand" the scientific opinions of the parties' experts. ECF Nos. 111 & 112. Winecup opposes this request as unnecessary. ECF No. 120. Federal Rule of Evidence 706 permits district courts, in their discretion, to appoint a neutral expert. FED. R. EVID. 706; *Gorton v. Todd*, 793 F.Supp.2d 1171, 1178 (E.D. Cal. 2011). "Expert witnesses should not be appointed where they are not necessary or significantly useful for the trier of fact to comprehend a material issue in a case." *Johnson v. Dunnahoe*, Case No. 1:08-cv-000640-LJO-DLB PC, 2013 WL 396009, at *2 (E.D. Cal. Jan. 31, 2013). It is not common for courts to appoint neutral experts and "usually do so only in exceptional cases in which the ordinary adversary process does not suffice or when a case presents compelling circumstances warranting appointment of an expert." *Womack v. GEO Grp., Inc.*, No. CV-12-1524-PHX-SRB (LOA), 2013 WL 2422691, at *3 (D. Ariz. June 3, 2013) (citations and internal quotations omitted). And courts are hesitant to appoint a neutral expert when parties have retained their own qualified experts. *See, e.g., Mallard Bay Drilling, Inc. v. Bessard*, 145 F.R.D. 405, 406 (W.D. La. 1993) (finding that because the parties retained their own qualified experts, the appointment of a neutral expert was "not likely to enlighten or enhance the ability of the Court to determine the pending issue.").

   Here, both parties have retained their own experts, and as discussed below, all are qualified. "The fact that the parties' experts have a divergence of opinion does not require the district court to appoint experts to aid in resolving such conflicts." *Oklahoma Natural Gas Co. v. Mahan & Rowsey, Inc.*, 786 F.2d 1004, 1007 (10th Cir. 1986) (citing *Georgia-Pacific Corp. v. U.S.*, 640 F.2d 328, 334 (Ct. Cl. 1980)). The Court finds that the legal issues and circumstances presented in this case are not so complex or exceptional that a neutral expert is needed to assist the trier of fact and, therefore, denies Union Pacific's motion to do so.

///

///

*ii.    Lindon is a qualified expert in hydrology and meteorology*

Union Pacific concedes that Lindon is a qualified expert in hydrology. ECF No. 111 at 16-17. Having reviewed Lindon's declaration detailing his 40-year work history in the field of hydrology, including work in hydrological assessments and modeling, dam inspections, and evaluations, the Court agrees that Lindon is qualified to opine on hydrology issues. *See* ECF No. 120-1.

Union Pacific argues that Lindon is not a qualified expert in meteorology because he does not hold a degree or certificate in the field. ECF No. 111 at 16. While a degree or certificate in a certain area is helpful to support expert qualification, a witness can be qualified by "knowledge, skill, experience, [or] training," as well as education. FED. R. EVID. 702. For 25 years, Lindon worked at the Utah Department of Natural Resources, Division of Water Rights, Dam Safety Section, in part, creating "hydrological models to simulate hypothetical storms and floods and re-create actual events, such as rain on snowpack events, that resulted in flooding and dam failures." ECF No. 120-1 at 3. He has "significant experience with hydrometerorology, surface water hydrology, modeling, and dam safety hydrology." *Id.* As a hydrologist, he regularly works with precipitation data, and is "familiar with analyzing and calculating precipitation numbers," receiving formal training on this topic in addition to his years of experience. *Id.* at 4. He is "active in the science of meteorology, working constantly with meteorologists at the Division of Water Resources and Salt Lake City National Weather Service office to develop products and methods for calculations." *Id.* He has taken continuing education courses in hydro-meteorology, and has "operated the National Weather Service Station for Park City, Utah for the past 26 years, measuring and reporting temperatures, snowfall, snowpack and precipitation daily." *Id.* Finally, as an adjunct professor in Civil Engineering at the University of Utah, Lindon taught a graduate level course that included water management and hydrometeorology. *Id.* at 5. While Lindon may not be a meteorologist by degree, he is clearly qualified to conduct the meteorological calculations and consider those calculations in reaching his expert opinion regarding the dam failure and subsequent flooding. The Court finds Lindon is a qualified expert in meteorology and hydrology, as it relates to his opinions in this specific case.

1

### iii.   *Lindon's expert testimony is admissible*

2
      Federal Rule of Evidence 702 governs the admissibility of expert testimony, providing:

3

> A witness who is qualified as an expert by knowledge, skill, experience, training,
4
> or education may testify in the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
5
> understand the evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable principles and
6
> methods; and (d) the expert has reliably applied the principles and methods to the
> facts of the case.

7
FED R. EVID. 702. Expert testimony must rest on a reliable foundation and be relevant to the task

8
at hand. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). There can be

9
no dispute that Lindon's expert testimony is relevant and advances a material aspect of Winecup's

10
case. *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) ("Expert opinion testimony is relevant

11
if the knowledge underlying it has a valid connection to the pertinent inquiry." (internal quotation

12
marks and citations omitted)). Lindon opines that the February 2017 flood event was greater than

13
a 100-year flood event. As discussed in more detail below, whether Winecup's dams could

14
withstand certain flood events pertains directly to the standard of care and whether Winecup acted

15
reasonably and are disputed questions of fact.

16
      To determine the reliability of the principles and methods used, the court looks to: (1)

17
whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer

18
review and publication; (3) the known or potential rate of error; (4) whether there are standards

19
controlling the technique's operation; and (5) whether the theory or technique has general

20
acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 592–94. "These factors

21
are 'meant to be helpful, not definitive, and the trial court has discretion to decide how to test an

22
expert's reliability as well as whether the testimony is reliable, based on the particular

23
circumstances of the particular case.'" *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d

24
807, 814 (9th Cir. 2014) (quoting *Primiano*, 598 F.3d at 564). The Court's "inquiry into

25
admissibility is a flexible one," in which the Court acts only as a gatekeeper, not a factfinder. *Id.*

26
at 813 (internal quotation marks and citations omitted). The court's role is to "screen the jury from

27
unreliable nonsense opinions, . . . not exclude opinions merely because they are impeachable."

28

1   *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (internal

2   quotation marks and citations omitted).

3       The Court finds that Lindon's opinions on both meteorology and hydrology are reliable.

4   Lindon created a hydrological model that simulates the February 2017 flood using the Hydrologic

5   Modeling System created by the Hydrologic Engineering Center within the U.S. Army Corps of

6   Engineers (known as "HEC-HMS"). ECF No. 120-1 at 5. This model is "industry standard used

7   by the Army Corps of Engineers . . . to simulate and re-create hydrologic process of watershed

8   systems." *Id.* Union Pacific does not argue that this modeling program is improper or not the

9   industry standard model. *See* ECF No. 111-7 (Union Pacific's hydrology expert declared that the

10  HEC-HMS is an acceptable method to calculate runoff). Winecup further provides that the model

11  is generally accepted in this scientific community and has been the subject of publications. *See*

12  ECF No. 120-2 at 5 ("HEC-HMS and HEC-RAS are probably the most extensively applied water-

13  related modeling systems in the world."); ECF No. 120-3. Lindon used "data from the U.S.

14  Geological Survey stream gages and Nation Weather Service stations to help form the model and

15  calibrate the results." ECF No. 120-1 at 5. Lindon declared that he checked and calibrated the

16  model ultimately determining with a "high degree of confidence that the model accurately reflects"

17  the February 2017 flood event. *Id.*

18      Union Pacific attacks Lindon's meteorology testimony, arguing that Lindon's model used

19  (1) an incorrect time period, and (2) the wrong weather station data. Lindon disputes both asserted

20  errors. The Court finds that both arguments go not to Lindon's methodology, but to the data

21  imputed. This is a question of accuracy, not admissibility, and it is best left to the jury to consider

22  the weight of this evidence. *See Emblaze Ltd. v. Apple Inc.*, 52 F. Supp. 3d 949, 959 (N.D. Cal.

23  2014) ("Even if data are imperfect, and more (or different) data might have resulted in a 'better'

24  or more 'accurate' estimate in the absolute sense, it is not the district court's role under *Daubert*

25  to evaluate the correctness of facts underlying an expert's testimony. Questions about what facts

26  are most relevant or reliable . . . are for the jury.") (internal quotations and citations omitted)).

27  Vigorous cross-examination and presentation of contrary evidence, not exclusion, are the

28  appropriate means of attacking whether Lindon used the "best" or "most accurate" data points, and

therefore created an accurate model of the flood event. *See Daubert*, 509 U.S at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Union Pacific attacks Lindon's hydrology testimony, arguing that (1) Lindon misapplied the "gage stream technique" and (2) used the wrong infiltration data. Lindon disputes that he erred as to either point. First, as to the gage stream technique, Union Pacific's expert concluded that because none of the six streams Lindon relied on were located in the "relevant watershed," this technique was "inferior" to the technique he used, the CN technique. Notably, Union Pacific's expert did not conclude that the technique was generally improper. Again, whether a technique is better or worse than another, or whether the expert made a computational error, should be left to cross-examination and presentation of contrary evidence; it is not appropriate to exclude such expert testimony. The Court will not conflate the question of admissibility with the weight to be given the testimony by considering the persuasiveness of competing scientific methods; those questions are for the fact finder. *See Ambrosini v. Labarraque*, 101 F.3d 129, 141 (D.C. Cir. 1996) ("By attempting to evaluate the credibility of opposing experts and the persuasiveness of competing scientific studies, the district court conflated the questions of the admissibility of expert testimony and the weight appropriately to be accorded such testimony by a fact finder."). Second, as to the infiltration data, disagreements over data imputes are again best left to cross-examination and presentation of contrary evidence.

Any further errors asserted by Union Pacific regarding Lindon's expert testimony are best left to cross-examination and presentation of contrary evidence as each goes to the weight of his testimony, not admissibility.[3]

> iv.   *Lindon's criticism of Union Pacific's hydrology expert, Daryoush Razavian, are admissible*

Union Pacific seeks to exclude Lindon's criticisms of its hydrology expert, Daryoush Razavian, regarding soil saturation. In conducting his hydrology analysis, Razavian used a

---

[3] In Union Pacific's second motion in limine, it further asserts that Lindon incorrectly opines that no floodwater from the 23 Mile dam failure reached mile post 670.03 when it was washed out. This is the subject of Winecup's first motion in limine; therefore, Union Pacific's arguments will be addressed below.

8

"Curved Number" of 92, which Lindon criticizes as being "too high." The Ninth Circuit has held that the "[a]uthority to determine the victor in such a 'battle of expert witnesses' is properly reposed in the jury." *Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001) (citation omitted). When a party challenges the correctness of the opposing party's expert's testimony, "its recourse is not exclusion of the testimony, but, rather, refutation of it by cross-examination and by the testimony of its own expert witnesses." *Id.*

Lindon and Razavian are both experts in their fields but have come to differing conclusions on soil saturation. However, it is not for the Court to conclude which expert is correct; that is for the jury to decide. Lindon will be permitted to disagree with Razavian's conclusions just as Razavian will be permitted to disagree with Lindon's. That is part of the adversarial process—both sides present their expert's opinions, challenging each other where they think the other erred, and then it is up to the jury to decide whom to believe. Accordingly, Union Pacific's first and second motions in limine are denied.

2. Union Pacific's third motion in limine to facilitate efficient management of exhibits and testimony (ECF No. 122) is granted in part and denied in part.

Union Pacific's third motion requests that the jurors be provided with three binders of pre-admitted exhibits (containing "200 or so" exhibits) at the outset of trial. ECF No. 122 at 2. Union Pacific argues that doing so would enable a smooth presentation of exhibits to the jury. *Id.* at 2-3. Additionally, Union Pacific does not object to Winecup providing jurors with their own binders. *Id.* at 3. Winecup objects to the presentation of exhibit binders arguing that doing so would require the court to rule on the admissibility of all contested exhibits prior to trial, and that given the number of exhibits, juror binders are "impractical, burdensome, and awkward." ECF No. 158 at 2-3.

The Court recognizes that "[i]t is time-consuming when counsel circulate exhibits among the jurors, and it disrupts the examination of witnesses, except where the physical qualities of an object are themselves relevant." MANUAL FOR COMPLEX LITIGATION (FOURTH) § 12.32 (2004). And while "[i]n some cases, it may be cost-effective for counsel simply to provide jurors with individual binders containing indexed copies of selected exhibits central to the presentation at

trial," electronic display systems that show everyone in the courtroom the exhibit simultaneously likewise "significantly assist jury involvement and comprehension and expediate trial." *Id.* The Court finds that multiple exhibit binders each with a few hundred exhibits is impractical and unnecessary given the electronics available in the courtroom. This District's courtrooms are fully equipped with an electronic exhibit display system that allows each juror to view exhibits on their own personal screen. The electronic display system further allows the parties to show the electronic exhibit to the witness first, before it is published to the jurors, and the witness may make useful electronic marks on the exhibit, such as circling or pointing to relevant portions. As the parties have already agreed to prepare their exhibits electronically, juror binders are unnecessarily redundant. *See* ECF No. 108 at 10. Additionally, the Court finds that the potential risk for jurors to view exhibits out of order, to lose focus during testimony, or be unable to take notes, weighs against providing such binders. The Court will however leave open the ability for parties to prepare jury binders solely for evidence that has been admitted during trial for the jurors to take with them into the jury room for deliberations if the parties prefer that over the electronic exhibits. However, electronic exhibits are capable of display on equipment in the jury room.

Union Pacific also requests that the Court permit and provide a means for jurors to take notes. ECF No. 122 at 3. Winecup does not oppose this request.[4] ECF No. 158 at 2. "The decision of whether to allow the jury to take notes is left entirely to the discretion of the trial court." *United States v. Baker*, 10 F.3d 1374, 1403 (9th Cir. 1993) (internal quotation marks omitted), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000). It is this Court's practice to allow jurors to take notes and given the complexity of this case, the number of exhibits, and the scientific expert testimony expected to be presented, the Court sees no reason to deviate from this practice. In allowing note taking, the Court finds it appropriate to give jurors Ninth Circuit Model Jury Instruction 1.18 Taking Notes, or one comparable, that is agreed on by the

---

[4] Union Pacific certified that it had met and conferred with Winecup prior to filing this motion in limine, as required by Local Rule LR II 16-3(a); however, Winecup does not oppose this request. The parties are reminded that the meet-and-confer is not perfunctory, and the parties should not seek Court intervention unless they have reached an impasse and have no other choice but to seek the Court's guidance.

parties. Accordingly, Union Pacific's third motion in limine (ECF No. 122) is granted in part and denied in part.

   3.   Union Pacific's fourth motion in limine to pre-admit exhibits for use in juror binders (ECF No. 123) is denied.

      In conjunction with its third motion in limine, Union Pacific motions this Court to pre-admit a number of exhibits (approximately 167) that would go in the requested juror binders. ECF No. 123. Winecup opposes the admittance of this contested evidence on relevancy and admissibility grounds arguing that whether these exhibits should be admitted should be determined within the context of trial. ECF No. 159. The Court agrees with Winecup. Additionally, the Court finds because the juror binders are unnecessary and impracticable, there is no need to pre-admit evidence for such binders. Union Pacific also requests the Court take judicial notice of seven exhibits. Winecup opposes, arguing that Union Pacific cites no authority or foundation for the Court on which to make such a ruling. Again, the Court agrees with Winecup: the Court cannot make a ruling on whether judicial notice is proper without sufficient information. Finally, Union Pacific requests leave to serve Rule 36 requests to establish admissibility of certain evidence. At this junction, Union Pacific should have witnesses that can testify to the authenticity and admissibility of the at-issue exhibits; reopening discovery so that Union Pacific can serve Rule 36 requests is therefore, unnecessary. However, the Court is hopeful that the parties can agree upon the admissibility of exhibits as much as reasonably practicable.

      Accordingly, the Union Pacific's fourth motion in limine to pre-admit exhibits for use in juror binders (ECF No. 123) is denied. The parties are encouraged to agree upon pre-admittance of any uncontested exhibits.

   4.   Union Pacific's combined fifth and sixth motion in limine to bar two opinions of Derek Godwin (ECF No. 139) is denied.

      Winecup's expert Derek Godwin provided opinions on three topics: (1) pre-flood design structures at mileposts 670.03, 672.14, 677.32, and 679.28; (2) re-routing costs and the reasonableness of the routes and costs; and (3) reconstruction costs and the reasonableness of

replacement structures. ECF No. 139-4 at 4. Union Pacific's combined fifth and sixth motion in limine pertains to Godwin's second and third opinions and argues that Godwin is not only unqualified to render opinions on these issues, but has insufficient factual knowledge and lacks any methodology to reach these opinions. ECF No. 139. Winecup opposes. ECF No. 160.

> i.   *Godwin's a qualified expert in railroad rerouting, costs, and railroad construction and design*

Under Federal Rule of Evidence 702, a witness may be qualified as an expert based on his or her knowledge, skill, experience, training, or education. Godwin's *curriculum vitae* provides that he has a degree in civil engineering with a concentration in "structures," and holds professional membership in the American Railway Engineering and Maintenance-of-Way Association, the American Short Line and Regional Railroad Association, and the Regional Engineering-Maintenance Suppliers Association. ECF No. 160-2. He further provides that he has been working for Class 1 and shortline railroads since 2005, starting his own railroad engineering and construction observation company in 2013. *Id.* Godwin declares that he has extensive experience in railroad construction and design, and specializes in "railroad engineering, railroad construction engineering, filed supervision, damage mitigation, working in hurricane, flood, and other emergency situations, and rebuilding railroads to restore service as quickly and efficiently as possible." ECF No. 160-6 ¶ 2. He declares that he has been "personally involved with rerouting for a Class 1 railroad approximately twelve times over the past six years." *Id.* The Court finds that this experience makes him qualified to offer opinions on rerouting, costs and repair, design, and construction of railroads, bridges, and culverts. Union Pacific's arguments against his qualifications go to the weight of his testimony, not admissibility, and are best left to vigorous cross-examination. *See Daubert*, 509 U.S. at 596.

> ii.   *Godwin's opinion on rerouting is admissible*

Godwin provides two opinions regarding rerouting costs: (1) "[a]ll train traffic should have been re-routed from (or near) Tecoma to (or near) Lucin on the No.2 track;" and (2) that other washouts, not attributable to Winecup, prevented trains from moving, and therefore, Winecup is not responsible for those rerouting costs. ECF No. 160-4 at 6. Godwin testified at his deposition

that he was familiar with what railroads need to consider when addressing rerouting, including which tracks were in service, crew variability, how many crews they have on standby, how many trains are running per day. ECF No. 160-3 at 44. Godwin further testified that he had reviewed Union Pacific's rerouting costs and crew costs as provided, and the number of trains per day. *Id.* at 45, 50.

There can be no dispute that Godwin's opinion is relevant and advances a material aspect of Winecup's case: Godwin's opinion goes directly to the amount of damages Union Pacific should be permitted to recover if the jury reaches the issue. Union Pacific does not argue that the considerations Godwin looked at, including tracks in service, crew variability, and trains per day, are not to be considered in reaching such a conclusion on rerouting costs—its own expert Stephen Dolezal considered characteristics for available tracks, which included run time between the end points of damaged tracks, track speeds, expected train sizes, and siding and auxiliary track availability. ECF No. 139 at 8. Rather, Union Pacific argues that its expert's rerouting analysis was more correct than Godwin's opinion based on these considerations. Union Pacific's arguments to exclude Godwin's opinion go not to admissibility, but to the weight and are best left to cross-examination during trial; the exclusion is denied.

### iii.   *Godwin's opinion on reconstruction costs is admissible*

Prior to the flood, there were earthen embankments and culverts at the washout locations. Union Pacific rebuilt these areas with steel bridges instead of rebuilding the embankments and culverts. Godwin opines that had Union Pacific rebuilt the earthen embankments and culverts, the cost of the track repair would have been substantially less than "upgrading" to steel bridges—only $4.28 million as opposed to the $18.5 million claimed by Union Pacific. *See* ECF No. 160-4 at 26. Godwin calculated the cost of rebuilding the embankments using data from RS Means 2018 and adjusted the total to 2017 prices. *Id.* Godwin testified that the RS Means methodology is the "industry standard" for estimating construction costs. ECF No. 160-3 at 77. Again, there can be no dispute that Godwin's opinion is relevant and advances a material aspect of Winecup's case and that the RS Means methodology for determining costs is standard in the industry. Union

Pacific's arguments in opposing Godwin's testimony are best left to cross-examination and presentation of opinion evidence by Union Pacific's own experts rather than exclusion.

Winecup argues that Union Pacific should only be permitted to recover the cost of replacing the culverts and embankments rather than the bridge "upgrade," and that it does not intend to argue whether culverts or bridges *should* have been built. The standard for calculating damages is an important and critical issue in this case, but it has not been fully or properly briefed by the parties: Winecup briefly noted the standard it believes is proper in its response to Union Pacific's combined fifth and sixth motion, while Union Pacific took the opportunity to argue for its standard in a 13-page reply, without any further response from Winecup. Before deciding on how damages are to be calculated, the Court will permit Winecup the opportunity to respond to Union Pacific's reply; briefing is not to exceed 15 pages of argument, excluding tables of contents and authorities and administrative notices. No other issues will be entertained without leave of the Court.

Therefore, Union Pacific's fifth and sixth motions in limine are denied.

5. <u>Union Pacific's seventh motion in limine to bar Winecup's contributory negligence defense and Derek Godwin's contributory negligence opinion (ECF No. 124) is denied.</u>

Union Pacific motions the Court to exclude both Winecup's contributory negligence defense and Godwin's expert opinions that relate to this defense. Winecup opposes. ECF No. 161. The Court will address each argument in turn.

i. *Winecup's contributory negligence defense is not preempted*

Union Pacific argues that 49 C.F.R. § 213.33 preempts Winecup from arguing that Union Pacific was contributorily negligence for maintaining culverts not sufficiently large enough to withstand a 50-year storm. Section 213.33 provides: "Each drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned." Winecup argues that this regulation does not "substantially subsume the subject matter of" culvert size, and therefore, it cannot preempt the state common law standard. Alternatively, even if the regulation did preempt the state common law standard, the federal standard would apply and not preclude the defense itself.

The Federal Railroad Safety Act ("FRSA") was enacted "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The Secretary of Transportation is given broad discretion to "prescribe regulations and issue orders for every area of railroad safety . . .." *Id.* § 20103(a). The FRSA also includes an express preemption provision: "A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement." *Id.* § 20106(a)(2). "Legal duties imposed on railroads by the common law fall within the scope of these broad phrases." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). The proponent of preemption must establish that the regulations more than "touch upon" or "relate to" the subject matter—"pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." *Id.*

The Court agrees with the *Gallo* Court's interpretation of the FRSA and the applicability of preemption in the negligence context.  Section 213.33 "only regulates the maintenance of existing drainage;" the regulations "are otherwise silent on when additional drainage is required, what kind of drainage is appropriate, and how drainage should be installed." *Gallo v. Union Pacific R.R. Co.*, 372 F.Supp.3d 470, 484 (W.D. Tex. 2019). Here, culverts and earthen embankments existed at the washed-out track locations. Winecup intends to introduce Godwin's opinion as evidence of what size culverts should be used based on the industry standard. While section 233.13 touches on drainage, it does not substantially subsume the subject matter—there is no specified standard for culvert size or what type of culvert should be used in this circumstance. Moreover, the Court finds that it would be illogical that a plaintiff would not be preempted from suing Union Pacific under a negligence theory for failure to maintain appropriate drainage, but that a defendant would not be able to assert an affirmative defense of contributory negligence for the same alleged failure. Accordingly, the Court finds that section 213.33 does not preempt Winecup's affirmative defense.

### ii.    *Godwin's opinions on pre-flood design structures are admissible*

Next, Union Pacific argues that two of Godwin's opinion related to Winecup's contributory negligence defense should be excluded: (1) Godwin opines that based on his experience in railroad

construction and design, that it is industry standard that railroads throughout the country use culverts large enough to handle flows associated with a 100-year storm; and (2) Godwin opines that the culverts in place before the flood were not large enough to withstand a 50-year storm. As the Court articulated above, Godwin is qualified to opine on such topics as railroad design and construction, based on his training and experience, which includes opining on the industry standard for culvert size in this context. And there can be no dispute that Godwin's opinion is relevant and advances a material aspect of Winecup's case: Godwin's opinion goes directly to whether Union Pacific was contributorily negligent for the damaged tracks. To reach his opinion, Godwin considered the drainage area and peak flows for hypothetical storm events—nothing in the record disputes that this is an appropriate method for making such a determination. Likewise, Union Pacific's other arguments go to the weight of his testimony, not admissibility, and are best left to vigorous cross examination.

Accordingly, the Court denies Union Pacific's seventh motion in limine.

6. <u>Union Pacific's eighth motion in limine to bar evidence or argument that a non-party is comparatively negligent (ECF No. 125) is granted in part and denied in part.</u>

Union Pacific requests that Winecup be barred from offering evidence or argument that a non-party is comparatively negligent, arguing that, under Nevada law, such evidence is irrelevant. ECF No. 125. Winecup opposes the motion, arguing that it is permitted to argue and offer evidence that they are either not negligent or that another party is completely negligent. ECF No. 162.

Under Nevada law, a "jury may not apportion fault to non-parties, and evidence or argumentation directed to showing non-parties' *comparative* fault is therefore inadmissible." *Phillips v. C.R. Bard, Inc.*, Case No. 3:12-cv-00344-RCJ-WGC, 2015 WL 260873, at *4 (D. Nev. Jan. 21, 2015) (emphasis in original). However, "[n]othing in NRS 41.141 prohibits a party defendant from attempting to establish that either no negligence occurred or that the entire responsibility for a plaintiff's injuries rests with nonparties[.]" *Banks ex rel Banks v. Sunrise Hosp.*, 102 P.3d 52, 67 (Nev. 2004). Therefore, the Court finds that under Nevada state law, Winecup is not permitted to offer evidence that a non-party is comparatively negligent. However, Winecup may argue that it is not negligent or that a non-party is solely responsible, and Winecup may proffer

admissible evidence in support thereof. Accordingly, Union Pacific's eighth motion in limine (ECF No. 125) is granted in part and denied in part.

> 7. <u>Union Pacific's ninth motion in limine to bar mention to the jury of the notion that Nevada's dam statutes and regulations do not apply to the Winecup dams due to their age (ECF No. 126) is denied.</u>

Union Pacific argues that Winecup should be precluded from arguing before the jury that any of Nevada's dam statutes and regulations—Nevada Revised Statutes ("NRS") 535.005 *et seq.* and Nevada Administrative Code ("NAC") 535.010 *et seq.*—do not apply to the Winecup dams. ECF No. 126. Union Pacific cites several sections of the NRS and NAC that it argues plainly apply to the Winecup dams, and letters from the State Engineer which show that Winecup was aware that certain sections of these statutes and regulations applied to the dams. *Id.* Winecup does not dispute that some of Nevada's dam statutes and regulations apply to its 23 Mile and Dake dams; however, it argues that a blanket ruling that it can't argue that any of these regulations or statutes do not apply is overbroad and contrary to a plain reading of many of the sections. ECF No. 163.

The Court agrees with Winecup: any ruling that Winecup is precluded from arguing that a specific statute applies in this case must be made on a statute-by-statute/ regulation-by-regulation basis. Accordingly, Union Pacific's ninth motion in limine (ECF No. 126) for a blanket ruling is denied.[5]

> 8. <u>Union Pacific's tenth motion in limine requesting that the Court instruct the jury before trial about certain laws that apply to Nevada dam owners (ECF No. 127) is denied without prejudice.</u>

Union Pacific requests that the Court order the parties to try to agree on (or submit competing) preliminary jury instructions relating to the statutes and regulations that apply to dam owners in Nevada. ECF No. 127. Union Pacific does not provide the actual language of a proposed instruction, but simply lists the statutes and regulations upon which it proposes the parties craft preliminary instructions. *Id.* Winecup opposes, arguing that the proposed instructions are improper standard of care instructions for a negligence case,[6] the proposed list is biased in favor of Union

---

[5] The Court notes Winecup raises such a specific argument in its second motion in limine—whether Winecup can argue that NAC § 535.240 does not apply to its dams—which the Court addresses below.

[6] Winecup's second and third motions in limine also relates to the standard of care to be used in this negligence case. The Court directs readers to Part III.B.2-3 below for a larger discussion on this issue, as it is related but not entirely on point to Union Pacific's tenth motion in limine.

Pacific, and if the Court is inclined to give such instructions, then it should also preliminarily instruct the jury as to all elements of negligence in a neutral and accurate manner. ECF No. 164.

The Court generally instructs the jury preliminarily on issues related to trial procedure, the judge's duties and role, and the jurors' role and responsibilities in a civil case. As a general matter, it does not instruct the jurors on substantive issues at that time. The Court finds that this trial presents no extenuating circumstance or reason to deviate from this process, especially given that the parties are not in agreement as to any of the proposed instructions. Accordingly, the Court denies Union Pacific's tenth motion in limine (ECF No. 127).

9. <u>Union Pacific's eleventh motion in limine to bar Rule 702 opinions (A) generally, if not in expert reports, and (B) specifically, from Luke Opperman (ECF No. 128), and its related nineteenth motion in limine to preclude experts disclosed on May 13, 2020 (ECF No. 175), are denied without prejudice.</u>

Union Pacific motions the Court to prohibit Winecup from offering any expert witnesses, including expert testimony from Luke Opperman, the Nevada Department of Water Resources engineer who inspected both the 23 Mile Dam and the Dake Dam before and after the incident, because he was not disclosed as an expert and Winecup failed to provide a written report as required under Federal Rule of Civil Procedure 26(a)(2)(A)-(B). ECF No. 128. Winecup opposes the motion arguing that Opperman is not a retained expert, and therefore, it did not violate Rule 26 by not submitting a written expert report to Union Pacific. ECF No. 165. Winecup further argues that because Opperman is a neutral expert, deposed by both parties, and listed in Union Pacific's witness disclosures, Union Pacific will not be prejudiced by his testimony. *Id.* On May 13, 2020, two days before Winecup filed this opposition, it served Union Pacific with a supplemental expert disclosure that provided that Winecup intended to call Luke Opperman, and April Holt and Edward Quaglieri (additional individuals that inspected Winecup's dams), as non-retained experts. ECF No. 175-1. In response, Union Pacific moves in its nineteenth motion in limine to preclude these three witnesses from offering expert testimony because of the late disclosure. ECF No. 175. Again, Winecup opposes, arguing that its supplemental disclosure was timely and sufficient under Federal Rule of Civil Procedure 26(a)(2)(C). ECF No. 190.

Federal Rule of Civil Procedure 26(a)(2)(A) provides: "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rules of Evidence 702, 703, or 705." And, "[u]nless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report--prepared and signed by the witness--if the witness is one *retained* or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." FED. R. CIV. P. 26(a)(2)(B) (emphasis added). From a plain reading of this Rule, it is clear to the Court that a written expert report is only required if the expert is retained. Here, neither party disputes that Opperman, Holt, or Quaglieri are not retained experts, and therefore, if Winecup intends for them to present evidence under Federal Rules of Evidence 702, 703, or 705, Winecup was only required to disclose "(i) the subject matter on which the witness is expected to present evidence;" and "(ii) a summary of the facts and opinions to which the witness is expected to testify." FED. R. CIV. P. 26(a)(2)(C).

On October 15, 2018, the parties exchanged initial disclosures of expert witnesses: the plaintiff disclosed three experts with reports, and five experts without reports, and defendant disclosed two experts with reports. ECF No. 80 at 2. The parties stipulated to extend rebuttal expert disclosures until November 19, 2018, at which time, Winecup disclosed two rebuttal witnesses. *Id.*; ECF No. 175-2. In April 2018, the parties deposed Holt and Quaglieri, and in April 2019, the parties deposed Opperman. It was not until May 13, 2020, that Winecup disclosed in its supplemental expert disclosure that it intended to call Opperman, Holt, and Quaglieri as non-retained experts. ECF No. 175-1.

While Winecup clearly could not have disclosed any of these experts at the initial October 2018 disclosure date (as none had yet to be deposed), Winecup could have disclosed that it intended to call Holt and Quaglieri in its November 2018 rebuttal disclosure, and could have disclosed Opperman well before May 13, 2020. Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness . . . unless the failure was substantially justified or is harmless." The Court finds that while Winecup's disclosure that it intends to have

these witnesses testify as a non-retained experts was technically late, Union Pacific has not been prejudiced by this late disclosure and it is harmless. Winecup provides that it only intends to have these experts testify to that which is contained within their respective depositions and reports. Moreover, Opperman, Holt, and Quaglieri are all listed in the parties' joint pre-trial order as witnesses that both Union Pacific and Winecup may call, and both parties are well aware of the proposed testimony of each witness. *See* ECF No. 108 at 11. While Union Pacific argues that these witnesses may not be qualified to offer opinion testimony, the Court reserves ruling on specific testimony for trial. Therefore, the Court denies Union Pacific's eleventh and nineteenth motions in limine.

          10. <u>Union Pacific's twelfth motion in limine to bar evidence or argument about (A) the Oroville Dam spillway failure, or (B) weather or (C) flood conditions in watersheds west of the relevant one (ECF No. 129) is denied without prejudice.</u>

Union Pacific motions the Court to bar Winecup from offering evidence of the Oroville Dam spillway failure and the weather and flood conditions that occurred in February 2017 in California and western Nevada. ECF No. 129. Union Pacific argues that due to the complexity of the Oroville Dam failure, evidence and argument on the topic would result in a "mini trial," and as the weather and flooding occurred outside the relevant watershed, the evidence is irrelevant. *Id.* Winecup opposes the motion arguing that whether the storm that caused the dam's failure was a historic storm event is a question for the jury and therefore, Winecup should be permitted to offer evidence of the historic storm. ECF No. 166.

The Court finds that whether the proffered evidence is relevant or if it would be unfairly prejudicial is best determined at trial when it can be adjudged in context. Additionally, the Court finds that Union Pacific's request that evidence of weather and flood conditions in watersheds other than in the "relevant one," with no definition of "relevant," is overly broad and the Court cannot make a ruling on that basis. Accordingly, the Court denies Union Pacific's twelfth motion in limine without prejudice and reserves the issue for trial.

///

///

///

11. Union Pacific's thirteenth motion in limine to bar evidence or argument related to an "Act of God" defense (ECF No. 130) is denied without prejudice.

Union Pacific argues that Winecup is barred from asserting an "Act of God" defense. Union Pacific argues that because Winecup was required under Nevada law to maintain the 23 Mile dam to withstand a 100-year flood event and the Dake dam to withstand a 1000-year flood event, the failure of the dams and the subsequent flooding could not be considered "abnormal" or free from "human assistance or influence" such that Winecup could prove the prima facia elements of the defense. ECF No. 130. Winecup opposes this motion for two reasons: (1) because N.A.C. § 535.300 sets forth the requirement for new construction of dams, not existing dams; and (2) because there is ample evidence that the storm that preceded 23 Mile dam's failure, exceeded a 100-year flood event. ECF No. 167.

An Act of God "must be such a providential occurrence or extraordinary manifestation of the forces of nature that it could not reasonably have been foreseen, and the effect thereof avoided by the exercis[e] of reasonable prudence, diligence and care, or by the use of those means which the situation renders reasonable to employ." *Alamo Airways, Inc. v. Benum*, 374 P.2d 684, 686 (Nev. 1962). Whether an Act of God caused 23 Mile dam's failure and subsequent flooding and damage to Union Pacific's railroad tracks is an issue of fact for the jury. *See Francis v. MSC Cruises, S.A.*, Case No. 18-16463-CIV-SELTZER, 2018 WL 4693526, at *1 (S.D. Fla. 2018) ("[T]he issue of whether there was a *force majeure* or Act of God that caused the incident is an issue of fact, which cannot be decided on a motion to strike."). Further, whether Winecup presents sufficient evidence during trial to support giving the jury an Act of God instruction must be determined at trial. Accordingly, Union Pacific's motion (ECF No. 130) is denied without prejudice.

12. Union Pacific's fourteenth motion in limine to bar evidence or argument about consulting experts (ECF No. 131) is denied without prejudice.

Union Pacific requests the Court bar Winecup from asking questions or offering evidence or argument about "consulting experts," pursuant to Federal Rule of Civil Procedure 26(b)(4)(D). ECF No. 131. Union Pacific argues that it had previously hired consulting experts early in the case

1   who were eventually replaced by those now acting as testifying experts, which Winecup tried to

2   learn about during discovery. *Id.* Winecup does not oppose prohibiting asking questions or offering

3   evidence or argument about the plaintiff's consulting experts, so long as "consulting expert" means

4   "expert employed only for trial preparation." ECF No. 168 at 2. However, Winecup argues that

5   they should be permitted to ask questions about any expert or employee hired by the plaintiff that

6   was not "in anticipation of litigation or to prepare for trial." *Id.* Furthermore, Winecup argues that

7   "to the extent Union Pacific's testifying experts relied on information from a 'consulting' expert,

8   that information would also be admissible," pursuant to Federal Rule of Evidence 705. *Id.*

9          Under  Federal Rule of Civil Procedure 26(b)(4)(D), a party may not discover "by

10   interrogatories or deposition . . . facts known or opinions held by an expert who has been retained

11   or specially employed by another party in anticipation of litigation or to prepare for trial and who

12   is not expected to be called as a witness at trial." Under Federal Rule of Evidence 705, "[u]nless

13   the court orders otherwise, an expert may state an opinion—and give the reasons for it—without

14   first testifying to the underlying facts or data. But the expert may be required to disclose those

15   facts or data on cross-examination." "When experts serve as testifying witnesses, the discovery

16   rules generally require the materials reviewed or generated by them to be disclosed, regardless of

17   whether the experts actually rely on those materials as a basis for their opinions." *S.E.C. v. Reyes*,

18   Case No. C 06-04435 CRB, 2007 WL 963422, at *1 (N.D. Cal. Mar. 30, 2007).

19          The Court agrees with Union Pacific that under Rule 26 of the Federal Rules of Civil

20   Procedure, Winecup is prohibited from asking questions or offering evidence or argument about

21   the plaintiff's consulting experts. However, the Court also agrees with Winecup that if Union

22   Pacific's testifying expert relied on information from a consulting expert, that information would

23   be admissible under Rule 705 of the Federal Rules of Evidence. The Court assumes that the parties

24   will follow these rules; therefore, it denies Union Pacific's fourteenth motion in limine without

25   prejudice (ECF No. 131), and reserves any ruling on this issue for trial.

26   ///

27   ///

28   ///

13. <u>Union Pacific's fifteenth motion in limine to bar one paragraph in email referencing contract truck driver incidents (ECF No. 132) is granted.</u>

Union Pacific requests the Court bar Winecup from admitting a paragraph of an email from a Union Pacific employee discussing traffic incidents with a Nevada Department of Transportation employee. ECF No. 132. The offending language in the email states:

> I was able to contact one NDOT manager. He told me that there were three 3 separate incidents with UP contract truck drivers yesterday (Sunday). One driver entered the work area at a high rate of speed (over 55 MPH), one passed an NDOT supervisor in her NDOT truck in a single lane area- almost forcing her off the road, one went around a flagged instead of stopping. That has NDOT gun shy now.

ECF No. 132-1. Union Pacific argues that under Federal Rules of Evidence 402, 403, 701, and 702, this paragraph is irrelevant, unfairly prejudicial, and inadmissible hearsay without an exception. Winecup argues that the email paragraph is neither irrelevant or prejudicial, and any such ruling should be made at trial, and that it is not hearsay because it is an opposing party's statement pursuant to Federal Rule of Evidence 801(d)(2)(D).

A statement that is offered against an opposing party and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed" is not hearsay. FED. R. EVID. 801(d)(2)(D). And emails by a party's agent or employee, when a proper foundation is laid, that shows the statements were made within the scope of employment, may constitute opposing party statements. *See Sea-Land Serv., Inc. v. Lozen Int'l, LLC*, 285 F.3d 808, 821 (9th Cir. 2002) (finding that when proper foundation for the authenticity of an employee's email has been laid, and the email was sent within the scope of employment, the email is admissible under Federal Rule of Evidence 801(d)(2)(D)). Here, the email communication between Union Pacific's employees appears to be within the scope of their employment. However, the statements contained within the email are articulating what an NDOT manager *told* the Union Pacific employee. Therefore, while the email itself is not hearsay, the at-issue statements contained within it are, and an applicable hearsay exception is needed for them to be admissible. Winecup presents no such exception that would apply. Accordingly, the Court grants Union Pacific's fifteenth motion in limine (ECF No. 132) on hearsay grounds.

///

23

14. <u>Union Pacific's sixteenth motion in limine to bar two words in an email with profane reference (ECF No. 133) is denied without prejudice.</u>

Union Pacific requests the Court bar Winecup from admitting a portion of an email from a Union Pacific employee that contains the profane reference, "Sandbagging S.O.B's," arguing that if the email is admitted, the offending language should be redacted because it is irrelevant, unfairly prejudicial, and inadmissible opinion evidence. ECF Nos. 133; 133-1. Winecup opposes the motion arguing that the relevance and prejudicial impact of the evidence is best determined at trial, and that Union Pacific provides no argument why lay opinion that certain people were "sandbagging" requires an expert. ECF No. 170. The Court agrees with Winecup. Accordingly, Union Pacific's sixteenth motion is denied without prejudice and the Court reserves ruling on whether the terminology is either irrelevant, unfairly prejudicial or overly technical such that an expert is needed to testify, based on the context in which it is presented at trial.

15. <u>Union Pacific's seventeenth motion in limine to bar Winecup from providing trial testimony that contradicts its Rule 30(b)(6) witness's deposition testimony (ECF No. 134) is denied without prejudice.</u>

During the deposition of Winecup's designated Rule 30(b)(6) witness, James Rogers, he testified that he "did not know" the answers to several of Union Pacific's questions. ECF No. 134. Union Pacific now seeks to bar Winecup and Rogers from presenting testimony that contradicts his answers to these same questions from his deposition. *Id.* Winecup opposes this motion arguing that Ninth Circuit precedent permits a 30(b)(6) deponent that answered "I don't know" to supplement, contextualize, and even contradict such statements at trial, and that a 30(b)(6) deponent who answers "I don't know" to questions outside the scope of the 30(b)(6) notice is not penalized. ECF No. 171 at 4-5.

"A corporation *generally* cannot present a theory of the facts that differs from that articulated by the designated Rule 30(b)(6) representative." *Snapp v. United Transportation Union*, 889 F.3d 1088, 1103 (9th Cir. 2018) (quoting 7 James Wm. Moore et al., *Moore's Federal Practice* § 30.25[3] (3d ed. 2016)) (emphasis provided by *Snapp*). "This general proposition should not be overstated, however, because it applies only where the purportedly conflicting evidence truly, and without good reason or explanation, is in conflict, *i.e.*, where it cannot be

24

deemed as clarifying or simply providing full context for the Rule 30(b)(6) deposition." *Id.*

Moreover,

> the testimony of a Rule 30(b)(6) deponent does not absolutely bind the corporation in the sense of a judicial admission, but rather is evidence that, like any other deposition testimony, can be contradicted and used for impeachment purposes. The Rule 30(b)(6) testimony is also not binding against the organization in the sense that the testimony can be corrected, explained and supplemented, and the entity is not "irrevocably" bound to what the fairly prepared and candid designated deponent happens to remember during the testimony.

*Id.* at 1104 (quoting 7 James Wm. Moore, et al., *Moore's Federal Practice* § 30.15[3] (3d ed. 2016)). Given this binding Ninth Circuit precedent, the Court cannot make a blanket ruling that Winecup may not proffer testimony other than the "I don't know" answers Rogers articulated during his deposition to specific questions. Rather, the Court must make a ruling based in the context of trial whether any answer provided merely corrects, explains, or supplements the deposition testimony, or if it truly contradicts it. Accordingly, Union Pacific's seventeenth motion in limine is denied without prejudice, and the Court reserves ruling for trial.

16. Union Pacific's eighteenth motion in limine to bar Winecup from offering evidence or argument about preserving the Dake dam for pike (ECF No. 135) is denied in part and granted in part.

Union Pacific motions the Court to bar Winecup from offering evidence or argument that the Fish & Game[7] allegedly requested that the Dake dam be preserved for the pike they had put in it. ECF No. 135. Union Pacific cites an email from Bill Nisbet to James Rogers, in which he states:

> I recall some correspondence and discussion with David Walker in [the] 90s about Dake: one agency (state engineer) recommended he breach the dam; another agency (fish & game) wanted it preserved, for the pike they had placed in it. He was caught in the middle.

ECF No. 135-1. Union Pacific argues that whether an agency wanted to preserve the dam is irrelevant and is further triple hearsay. Winecup opposes the motion arguing that the information contained within the cited email is admissible under Federal Rule of Evidence 803(20) as a hearsay exception for a reputation in a community concerning general history. Alternatively, it argues that even if the email is inadmissible, that does not mean that Winecup should be barred from

---

[7] It is unclear whether the parties are referring to the Federal or State agency.

25

presenting any evidence regarding why it may have not decommissioned the Dake dam if Union Pacific opens the door to such evidence and argument. ECF No. 172.

The Court agrees with Union Pacific that the email cited is hearsay that does not fall within Rule 803(20): whether a state or federal agency requested that the Dake dam be preserved for pike is not "general historical events important to" the Elko or Nevada community. However, the Court agrees with Winecup that whether the email is admissible is a different question from whether evidence or argument regarding the preservation of the dam for pike is admissible. Union Pacific has presented no evidence or rule to support the Court's exclusion of any and all evidence or testimony on the issue. Accordingly, the Court grants Union Pacific's eighteenth motion in limine as it relates to the cited email and denies it without prejudice as it relates to the subject as a whole.

17. <u>Union Pacific's twentieth motion in limine to permit Union Pacific's witnesses to testify by video (ECF No. 176) is granted.</u>

Union Pacific moves this Court to permit its witnesses that must travel by plane or more than three hours by car[8] to testify via videoconference. ECF No. 176. Union Pacific argues that good cause appears to permit videoconferencing under Federal Rule of Civil Procedure 43(a) due to the COVID-19 pandemic. *Id.* Winecup opposes this request, arguing that it would be prejudiced if it is not able to cross examine Union Pacific's witnesses in open court, and that such an extraordinary order that all of a party's witnesses appear by video is unprecedented. ECF No. 191.

This case has been set for trial a number of times; the most recent setting for August 2020 was vacated due to the COVID-19 pandemic. ECF No. 195. At the time of this writing, the undersigned has presided over one criminal in-person jury trial since the COVID-19 lockdown orders went into effect in early March 2020, which included hearing from both witnesses in-person and via ZOOM video conferencing. The Court took numerous safety precautions in the courtroom to ensure that all participants, attorneys, witnesses, and the Court staff, were protected, which included installing plexiglass partitions and implementing sanitization protocols. The Court is satisfied that this procedure was effective at the time.

///

---

[8] Winecup argues this would apply to all of Union Pacific's witnesses. ECF No. 191 at 2, n.1.

However, since the Court held its first jury trial in September, the numbers of infected individuals in Washoe County has increased significantly, and led District Court Chief Judge Du to implement General Order 2020-03, postponing all in-person jury trials until further notice. Given this pandemic, the Court will allow witnesses to appear by ZOOM video conferencing. The Court is open to presiding over a bench trial via ZOOM video conferencing if the parties are amendable to such a solution. In that case, participating attorneys would appear in-person, and the Court would leave it to each party's counsel to determine which of its witnesses would appear by video or in-person. If the parties determine that a jury trial is necessary, the Court would likely not be able to set it before the middle of 2021 due to the backlog of criminal jury trials. At that time, the Court would expect participating attorneys to appear in-person, but it would again leave it to each party's counsel to determine which of its witnesses would appear by video or in-person. The Court notes that it is open to hearing any other mutually agreeable alternative to the options suggested by the Court as this case proceeds. Accordingly, Union Pacific's nineteenth motion in limine is granted.

18. Union Pacific's motion in limine to amend the Pretrial Order (ECF No. 193) is granted in part and denied in part.

Lastly, Union Pacific motions the Court to amend the pretrial order (ECF No. 108) to add information learned in the depositions of Paul Fireman and Clay Worden in *Winecup Gamble, Inc. v. Gordon Ranch, LP*, 3:17-cv-00163, related to Winecup's financial situation. ECF No. 193. Specifically, Union Pacific requests that it be permitted to amend its witness list to include Fireman and Worden to testify via their respective depositions from *Gordon Ranch*, and add the information to the undisputed fact section of the Order. *Id.* Winecup opposes, arguing that (1) it has not admitted these facts and they are not "undisputed;" (2) the facts are irrelevant; (3) Worden is a third-party witness whose deposition testimony is not admissible under Federal Rule of Evidence 801(d)(2) and Federal Rule of Civil Procedure 32(a)(8); and (4) that Union Pacific's failure to conduct this discovery during this case precludes it from now using the information.

The Ninth Circuit has made clear that district courts "should generally allow amendments of pretrial orders provided three criteria are met: (1) no substantial injury will be occasioned to the

opposing party, (2) refusal to allow the amendment might result in injustice to the movant, and (3) the inconvenience to the court is slight." *Amarel v. Connell*, 102 F.3d 1494, 1515 (9th Cir. 1996), as amended (Jan. 15, 1997) (internal quotation marks and citation omitted). The Court has "broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial," which includes "the power to exclude or admit expert testimony, and to exclude testimony of witnesses whose use at trial is in bad faith or would unfairly prejudice an opposing party." *Campbell Industries v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980) (internal citations omitted).

Paul Fireman was Winecup's sole shareholder and was initially a named party in the suit. It is clear to the Court that Fireman was, at least to some extent, an agent of Winecup, and Winecup makes no argument to the contrary. *See* FED. R. CIV. P. 32(a)(3) ("An adverse party may use for any purpose the deposition of a party or anyone who, when deposed, was the party's officer, director, managing agent, or designee under Rule 30(b)(6) or 31(a)(4)."). Winecup only argues that Fireman's deposition should be excluded as irrelevant and fails to make any showing that it will be substantially injured if the testimony is permitted. As discussed in full below, the Court will permit Union Pacific to argue the issue of punitive damages. However, pursuant to Nevada law, no information related to the financials of the defendant is permitted prior to the jury making a determination that punitive damages are warranted. The Court will not exclude Union Pacific from offering Fireman's deposition testimony at this time. However, Union Pacific may present this evidence only in the secondary proceeding to determine the amount of punitive damages, should the case reach this proceeding. Additionally, because the Court is best positioned to rule on relevancy issues at trial when it can consider the evidence in context, the Court will reserve ruling on the relevancy of Fireman's testimony until that second proceeding as well. The Court finds that allowing Union Pacific to amend the pretrial order on this issue will not result in injustice to Winecup and any inconvenience to the Court is slight.

Conversely, Clay Worden was never an employee of Winecup, and testified in *Gordon Ranch* in his individual capacity, not as a corporate witness or agent of Winecup. Under Federal Rule of Civil Procedure 32(a)(8), the deposition from an earlier action "may be used in a later action involving the same subject matter between the same parties." Here, there can be no dispute

that the parties are not the same and the subject matter is different—this is a negligence action while *Gordon Ranch* was a contract dispute. The Court finds that exclusion of Worden's deposition will not result in injustice to Union Pacific—it is still permitted to present evidence of Winecup's financial situation through Fireman should this case reach the punitive damages phase.

Finally, because Winecup has not "admitted" the facts as presented by Union Pacific, the Court will not permit Union Pacific to add the information to the "undisputed facts" section of the pretrial order. Union Pacific may add these facts to the statement of contested issues of fact and Winecup will likewise be permitted to list the facts contested. The Court finds that because this case has not been set for trial, this amendment to the pretrial order will not inconvenience the Court and does not prejudice either party. Further, Union Pacific indicates that the parties have separately agreed to amend the pretrial order to add trial exhibits. Accordingly, the Court grants in part and denies in part Union Pacific's twenty-first motion in limine to amend the pretrial order.

## B. Winecup's Motions in Limine

1. Winecup's first motion in limine to exclude Union Pacific's expert Daryoush Razavian's testimony related to mile post 670.03 (ECF No. 141) is denied.

Winecup motions the Court exclude the opinions and testimony of Union Pacific's hydrology expert, Daryoush Razavian, regarding the washout at mile post 670.030. ECF No. 141. Similarly, in its second motion in limine, Union Pacific motions the Court to exclude Winecup's expert, Matthew Lindon, from testifying on the same subject. Razavian opines that floodwater from 23 Mile dam split as it came downhill with some water heading toward the Dake dam while other water reached the tracks at mile post 670, causing a build-up of water that ultimately caused the washout of Union Pacific's tracks at mile post 670.03. ECF No. 111-7 ¶¶ 31-33. Winecup's expert, Matthew Lindon, disagrees and opines that the washout was caused by water from the Loray Wash and that floodwater from the 23 Mile dam could not have caused that track washout because the timing evidence shows that water from 23 Mile dam could not have reached mile post 670.03 at the time it was washed out. ECF No. 141-2 ¶¶ 7-8. For clarity, the Court address the parties' competing motions for exclusion together here.

///

       *i.*       *Union Pacific's late disclosure regarding Razavian's opinion on the washout at mile post 670.03, while untimely, is harmless and Razavian's opinions on the subject are admissible.*

       Winecup Gamble argues that Razavian did not offer an opinion on the cause of the washout at mile post 670.03 in his initial report, offering his opinion for the first time during his deposition. ECF No. 141 at 20-21. Razavian's expert report concludes the following regarding the cause of track washouts:

> 16. The flood surge that was initiated from Dake, with its ferocious forces and velocity travelled downstream causing breach of the downstream State Highway 233 and subsequently washout of UPRR track embankments/culverts at MP 672.14, MP 677.32, and MP 679.32.
>
> 17. UPRR's track embankment/culvert washouts was a direct result of the destructive forces of the flood surge caused by failure of the 23-Mile Dam and Dake's spillway/embankment.

ECF No. 141-4 at 17. The Court agrees with Winecup that this limited information does not specifically indicate that Razavian's opinion is that water from the 23 Mile dam caused the washout at mile post 670.03. However, his deposition testimony makes this opinion clear:

>     Q. Where did the water that washed out the embankment of -- at Milepost 670.03 come from?
>     A. In my opinion, majority of it was the flood pulse from breach of 23 Mile Dam.
> . . .
>     Q. How did [the flood water] get to 670.03 without going through the Dake Reservoir spillway?
>     A. There is a waterway, the Loray Wash, reaches Thousand Springs Creek downstream from Dake. So the runoff that washed out 670.03 went back into Loray Wash and ran along the track on the west side of the track and -- and showed up and merged with runoff that came through Dake.
> . . .
>     A. My aerial observation and topographic map of the area suggests that a portion -- during high level of flooding, a portion of runoff does indeed splits and goes towards 670.03 without going to -- through Dake.
> . . .
>     A. The runoff associated with the flood pulse coming from 23 Mile Dam that splits or bypassed Dake Reservoir in the form of sheet flow or overland flow bypassed Loray Wash, reached to the track, overtopped the track.
>     And once it overtopped the track, it was concentrated. And as we can see in this photo, was concentrated into the channel.
> So all the water that's -- that came in the form of overland runoff was concentrated in a channel. And that was the destructive force of the flow that washed out the track and largely stayed within the channel until that runoff reached back to Loray Wash.

ECF No. 141-5 at 8-9, 22.

Rule 26 of the Federal Rules of Civil Procedure states that an expert must provide "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). If expert opinions are not disclosed, "the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Razavian's February 27, 2019 deposition (occurring approximately two years before trial) and Razavian's January 17, 2020 declaration (provided approximately one year before trial) provide his opinion regarding the mile post 670.03 washout in great detail. The Court finds that Winecup has had more than enough time to consider this opinion and consult with its own expert on the subject such that it has not been prejudiced by Union Pacific's failure to disclose the opinion in Razavian's expert report. While this disclosure is technically untimely, it was harmless; therefore, the procedural failure does not provide a basis for exclusion under Rule 37.

Winecup also argues that Razavian's opinion on the subject should be excluded under Federal Rule of Evidence 702 because he does not rely on sufficient facts or data and does not use or apply reliable principles and methods to reach his opinion.[9] Razavian provides that his opinion on the mile post 670.03 washout is based on (1) his personal aerial observations and photographs taken of the area during a February 11, 2018 helicopter ride; (2) the lay of the vegetation in the area and damage to track embankments; (3) review of a topographic map of the area and the features of the land; (4) a photograph take by a news helicopter the day of the flood; (5) the presence of ice blocks on the tracks between mile post 669 at 670; and (6) an account in the Elko Daily from an NDOT Sheriff who noted that the water went around the Dake Reservoir. ECF No. 141-5 at 9-10, 12, 30-32; ECF No. 111-7 ¶¶ 35-42.  Razavian declares that "[a]ccepted hydrological methodology requires a hydrologist to consider all of the above evidence in determining flow of flood water." ECF No. 111-7 ¶ 43.

Winecup concedes that an accepted methodology includes using topographical survey data to determine if it is possible for water to escape one drainage and enter another. ECF No. 141 at 6.

---

[9] The Court relies on its above statements of law regarding its gatekeeper function in determining the admissibility of expert testimony and sees no reason to reiterate it here. *See* Part III.A.1.iii.

While it argues that Razavian's use of a topographical quadrangle map does not provide enough detail to map the flooding in the area (ECF No. 141-2 ¶ 18), that is an argument best left for cross examination and goes toward the weight not the admissibility of Razavian's opinion. Further, while Winecup argues that Razavian's observations were "superficial," Winecup has given the Court no reason to discount Razavian's opinion that considering the "empirical data" he observed in the area of a flood is an unacceptable methodology for determining the flow of a flood.

Winecup further argues that Razavian fails to offer an opinion that floodwater from the 23 Mile dam caused the washout at mile post 670.03. The Court disagrees. Razavian testified that it was his opinion that the "destructive force" of the runoff associated with the "flood pulse" from the 23 Mile dam failure washed out the tracks. While questions regarding estimations of the percentage overflow that came from 23 Mile dam verses from the floodwater in the Loray Wash due to the storm, and whether the Loray Wash had overtopped its banks without the addition of floodwater from 23 Mile dam go to the issue of causation, those are ultimately for the jury to decide and are different questions from whether Razavian offered an opinion that floodwater from 23 Mile dam caused the washout. Because Winecup's arguments go to the weight of Razavian's opinion on the subject, not admissibility of his opinions, the Court denies Winecup's first motion in limine (ECF No. 141).

      ii.    *Winecup's late Supplemental Third Disclosure regarding Lindon's rebuttal opinion on the washout at mile post 670.03, while untimely, is harmless, and Lindon's opinions are admissible.*

As discussed above, Razavian's opinion the subject was first disclosed during his February 2017 deposition. After Winecup became aware of these opinions, its own expert, Lindon, conducted an additional investigation to determine the cause of the washout, including an on-the-ground field inspection of the Loray Wash and a topographical survey of the area. ECF No. 141-2 ¶ 6. On July 12, 2019, following this additional investigation, Winecup submitted its Supplemental Third Disclosure, which included survey information, photographs taken during the site visit, an updated model, and Lindon's conclusion that water from the 23 Mile dam did not cause the washout of the tracks at mile post 670.03. *Id.*

///

"Generally speaking, supplementation of an expert report is proper where it is based on new information obtained after the expert disclosure deadline and the supplemental report was served before the time for pretrial disclosures." *Colony Ins. Co. v. Colorado Cas. Ins. Co.*, Case No. 2:12-cv-01727-APG-NJK, 2014 WL 12646048, at *2 (D. Nev. May 28, 2014).  Here, the material in the supplemental disclosure relates to Lindon's analysis after hearing Razavian's opinion from his February 2017 deposition. Lindon's opinion on the subject remained the same in this disclosure as it was in his prior report. And Union Pacific and Razavian have had this supplemental disclosure since July 12, 2019. While supplementation almost a year a half after the deposition is untimely, the Court finds that Union Pacific has had more than enough time to consider this opinion and consult with its own expert on the subject such that it has not not been prejudiced by this supplemental disclosure. Accordingly, the late disclosure was harmless, and Lindon will be permitted to testify on the subject.

In its second motion in limine, Union Pacific argues that Lindon's opinions regarding the cause of the mile post 670.03 washout should be excluded because he "ignored considerable evidence" that Razavian relied upon for his own opinion. ECF No. 112 at 10-12. Union Pacific's arguments on exclusion go to the weight of Lindon's testimony, not its admissibility, and are best left to cross examination and testimony by its own expert. Accordingly, the Court denies Union Pacific's requested exclusion.

> 2. <u>Winecup's second motion in limine to exclude evidence and argument that NAC section 535.240 applies to the 23 Mile and Dake dams (ECF No. 143) is denied.</u>

Winecup motions the Court to exclude Union Pacific from arguing or presenting evidence that NAC § 535.240 applies to the 23 Mile or Dake dams. ECF No. 143. Specifically, Winecup argues that this administrative regulation only provides the design standard for new construction of dams, not a standard of care for existing dam owners, and even if it did set forth a standard of care, the regulation cannot be applied retroactively to Winecup's dams because both were constructed prior to March 15, 1951. *Id.* Winecup concedes that the Nevada Department of Water Resources classified the 23 Mile dam as a low hazard dam and the Dake dam as a significant hazard dam. *Id.* at 3. Based on these classifications, Union Pacific argues that pursuant to NAC

§ 535.240, Winecup was required to "construct, operate, and maintain," the 23 Mile dam to withstand a 100-year flood event, and the Dake dam to withstand a 1000-year flood event. ECF No. 89 ¶¶ 16, 32, 50; ECF No. 154.

First, Winecup argues that a plain reading of the text of NAC § 535.240 shows that the applicability of the statute is limited to approval for new construction, reconstruction, or alterations, but it does not apply to dams in existence before the statute went into effect that have not been modified or altered. This regulation, titled Requirements for approval. (NRS 532.120, 535.010), provides:

> 1. Except as otherwise provided in NAC 535.220, to obtain the approval of the State Engineer pursuant to NRS 535.010, the plans and specifications must, in addition to all other applicable requirements, demonstrate to the satisfaction of the State Engineer that:
>> (a) The dam and reservoir are able to accommodate the inflow design flood for the tributary watershed without the failure of the dam or any other unintended release of water.
>> (b) The inflow design flood selected is appropriate given the intended purpose, hazard classification and size of the dam.
> 2. For the purposes of this section, the inflow design flood used for design purposes must not, except as otherwise provided in subsection 3, be less than:
>> (a) A probable maximum flood, if the dam:
>>> (1) Is classified as high hazard or is a large dam and classified as significant hazard; or
>>> (2) Lacks one or more spillways.
>> (b) A flood whose annual chance of exceedence is 0.1 percent, if the dam is a small or medium dam and is classified as significant hazard.
>> (c) A flood whose annual chance of exceedence is 1 percent, for all other dams.
> 3. The State Engineer will approve plans that use an inflow design flood which is less than those set forth in subsection 2 if the applicant provides an incremental damage analysis that demonstrates, to the satisfaction of the State Engineer, that a lesser event is appropriate.
> 4. An applicant may use one or more watershed diversion structures in lieu of spillways for the protection of a dam embankment so long as:
>> (a) The impoundment created by the embankment so protected is temporary; and
>> (b) The diversion structures are designed to accommodate the greater of the inflow design flood or five times the expected life of the impoundment.
> 5. A dam must have freeboard adequate to prevent overtopping by wave run-up and reservoir fetch above the storm surcharge elevation. The adequacy of the freeboard must be demonstrated by evidence satisfactory to the State Engineer in the form of:
>> (a) A wave run-up and reservoir fetch calculation; or
>> (b) Proof that the freeboard is not less than 3 feet above the storm surcharge elevation.
> 6. As used in this section, "storm surcharge elevation" means the elevation that the water surface would reach if the inflow design flood of a dam were added to a reservoir that is at its maximum conservation elevation.

34

NRS § 535.010 provides that this approval process pertains to "construction, reconstruction or alteration" of the dams. Winecup argues that neither 23 Mile dam nor Dake dam have been reconstructed or altered, and therefore, NAC § 535.240 does not apply. Winecup further argues that pursuant to NAC § 353.300, because the dams were in existence prior to March 15, 1951, it did not need approval to impound water, i.e. "maintain" the dams; and thus, these dams are not held to the flood standards in NAC § 535.240.

Union Pacific argues that these standards apply to both dams: it applies to 23 Mile dam because Winecup illegally, without proper approval, modified the outlet pipes in 1996 and was supposed to investigate the hydraulic adequacy of the dam with respect to flooding; and it applies to Dake dam because Winecup improperly abandoned the dam without applying for and having a decommissioning plan approved. ECF No. 154. These two acts—modification and abandonment—constitute the "construction, reconstruction, or alterations" contemplated in NRS § 535.010. Union Pacific further argues that Chapter 535 of the NAC specifies when certain regulations do not apply to dams in existence prior to March 15, 1951, which indicates that any regulation without that specific exclusion applies to all dams.

NAC § 535.240 is the only place in Chapter 535 that explains, colloquially, that a significant hazard dam must withstand a 1000-year flood event and a low hazard dam must withstand a 100-year flood event.[10] The State Engineer will assign all dams a hazard classification. *See* NAC § 535.140. It is uncontested that 23 Mile dam is classified as a low hazard dam, and Dake dam as a significant hazard dam.[11] The State Engineer is also authorized to inspect all dams and order dam owners to make modifications and alterations necessary for safety, which presumably is based on the hazard classification of the dam. *See* NRS § 535.030. The Court

---

[10] *See* NAC § 535.055 ("Inflow design flood" means "a hypothetical flood of a given magnitude that is used to determine the design of a dam and its related hydraulic features."); NAC § 535.080 ("Probable maximum flood" means "a hypothetical flood whose magnitude is: 1. The Largest that could be expected from the most severe combination of critical meteorological and hydrological conditions that are reasonably possible for the region in which the dam is located; and 2. Such that there is virtually no chance of its being exceeded.").

[11] In the event of a dam failure, a significant hazard dam carries a "(1) reasonable probability of causing loss of life; or (2) high probability of causing extensive economic loss or disruption in a lifeline;" and a low hazard dam carries a "(1) Very low probability of causing a loss of human life; and (2) Reasonable probability of causing little, if any, economic loss or disruption in a lifeline." NAC § 535.140.

considers the overall statutory and regulatory scheme and finds that the hazard classifications assigned by the State Engineer must be considered within the context of NAC § 535.240. And, necessarily, the regulation must apply to all dams, not just those in existence after March 15, 1951.

Second, Winecup argues that even if it does apply, it cannot have retroactive applicability. In Nevada, "[r]etroactivity is not favored," and courts generally interpret regulations to "only operate prospectively unless an intent to apply them retroactively is clearly manifested." *Cnty. Of Clark v. LB Props., Inc.*, 315 P.3d 294, 296 (Nev. 2013) (internal quotation marks and citations omitted). However, "if a regulation is a first-time interpretive regulation, application to preexisting issues may be permissible." *Id.* (citing *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 744 n.3 (1996)). The Court finds that NAC § 535.240 is not a "first-time" interpretive regulation. It was first added to the regulatory schedule in 2003, along with the definitions in NAC § 535.055, Inflow design flood, and NAC § 535.080, probable maximum flood. However, each regulation was enacted under the authority of NRS § 532.120, which confers upon the State Engineer the power to make such rules and regulations as may be necessary for the proper and orderly execution of its powers. Thus, these regulations are not interpretive, but legislative and should not apply retroactively.

While these regulations do not provide the standard of care, evidence and argument related to NAC § 532.240 may be presented to support a standard of care under the reasonable person standard. The Court will not preclude Union Pacific from presenting evidence and argument that a reasonable dam owner would have followed this regulation and maintained all dams to withstand the particular flood event based on the assigned hazard classification of its dam, including the flood standard. Therefore, the Court denies Winecup's motion to preclude any mention of this regulation.

### 3. Winecup's third motion in limine to exclude argument related to Union Pacific's claim for negligence per se (ECF No. 149) is granted.

Winecup argues that Union Pacific should be precluded from offering evidence of negligence per se because it cannot be based on administrative regulations and the one statute that it believes Union Pacific pleads under this theory, NRS § 535.030, also fails. ECF No. 149. Union

Pacific argues that not only does NRS § 535.030 provide an appropriate basis for its negligence per se claim, but so does NRS § 535.010. ECF No. 155.

First, the Court agrees with Winecup that under Nevada law, a violation of an administrative regulation cannot form the basis of negligence per se because "it lacks the force and effect of a substantive legislative enactment." *Price v. Sinnott*, 460 P.2d 837, 839-40 (Nev. 1969). Rather, "proof of a deviation from an administrative regulation is only evidence of negligence; not negligence per se," and likewise, "proof of compliance with such a regulation" is not proof of due care, but simply evidence of such care. *Id.* at 840. Union Pacific pleads in its second amended complaint that the following Nevada Administrative Codes impose a standard of conduct obligating Winecup to act in accordance: NAC §§ 535.370, 535.040, 535.240, 535.320. ECF No. 89 ¶ 32. While Union Pacific pleads that it "may rely on additional statutes and administrative codes that may become known to be applicable in the future," it does not list any Nevada Revised Statute that would provide the basis for its negligence per se claim. Because Union Pacific cannot rely on these administrative regulations to support negligence per se, the Court grants Winecup's motion as it relates to these and any other administrative regulation Union Pacific would consider proffering in support.

Second, Winecup addresses Nevada Revised Statute § 535.030, which it claims also cannot provide the basis for Union Pacific's negligence per se claim. "A statutory violation is negligence per se if the injured party belongs to the class of persons whom the statute was intended to protect, and the injury suffered is of the type the statute was intended to prevent." *Atkinson v. MGM Grand Hotel, Inc.*, 98 P.3d 678, 680 (Nev. 2004). NRS § 535.030, titled Inspection of dams by State Engineer; powers of State Engineer to protect life or property, provides:

> 1. The State Engineer from time to time shall:
>     (a) Make inspections of dams at state expense for the purpose of determining their safety; and
>     (b) Require owners to perform at their expense such work as may be necessary to supply the State Engineer with information as to the safety of such dams.
> 2. The owners shall perform at their expense any other work necessary to maintenance and operation which will safeguard life and property.
> 3. If at any time the condition of any dam becomes so dangerous to the safety of life or property as not to permit sufficient time for the issuance and enforcement of an order relative to the maintenance or operation thereof, the State Engineer may,

if he or she deems it necessary, immediately employ the following remedial measures to protect either life or property:
    (a) Lower the water level by releasing water from the reservoir.
    (b) Completely empty the reservoir.
    (c) Take such other steps as may be essential to safeguard life and property.
4. The provisions of this section shall not apply to works constructed by the United States Bureau of Reclamation or the United States Army Corps of Engineers.

By a plain reading of section 1 of this statute, the State Engineer determines what work is *necessary* to maintain the safety of the dam. Section 3 of this statute further supports this reading as it provides specific instances when the State Engineer can act to protect life and property. Additionally, the title of this statute, specifically indicating the powers of the State Engineer to protect life or property, further supports this reading. Here, per the State Engineer's September 2016 Inspection Report (the inspection completed approximately five months before the February 2017 flood event), there were "no conditions that require immediate attention" to maintain the 23 Mile dam. *See* ECF No. 155-6. Accordingly, the record does not support a finding that Winecup violated the State Engineer's orders.

      Section 2 provides that the owner is responsible for other maintenance that is *necessary* to safeguard life and property. This provision does not fix a standard legal duty; it is much too broad and leaves open to interpretation what work is necessary for dam owners to maintain and operate their dams safely. *See Sagebrush, Ltd. v. Carson City*, 660 P.2d 1013, 1015 (Nev. 1983) ("Whether a legislative enactment provides a standard of conduct in the particular situation presented by the plaintiff is a question of statutory interpretation and construction for the court."); *Shamnoski v. PG Energy*, 579 Pa. 652, 671 (Pa. 2004) (reasoning that for a negligence per se holding, "the statute at issue would have to be so specific as to leave little question that a person or entity found in violation of it deviated from a reasonable standard of care." (citing *Beaver Valley Power Co. v. Nat'l Eng'g & Contracting Co.*, 883 F.2d 1210, 1221 (3d. Cir. 1989)). Therefore, as a matter of law, the Court finds that section 2 of this statute cannot form the basis of a negligence per se claim and Winecup's motion is granted. However, that does not mean that section 2 would not be useful in proving duty and breach under the "reasonable man" standard: Union Pacific may present evidence that Winecup failed to act as a reasonable dam owner by failing to perform work necessary to safeguard life and property, as required by this statute.

1    Though not addressed in Winecup's motion, Union Pacific argues that it also pleads

2  violations of NRS § 535.010 to support its negligence per se theory. This statute, titled

3  Construction, reconstruction or alteration of dam: Permit to appropriate water required; notice;

4  approval of plans and specifications; inspection; exemptions; penalty, provides:

5           1. Any person proposing to construct a dam in this state shall, before beginning
          construction, obtain from the State Engineer a permit to appropriate, store and use
6          the water to be impounded by or diverted by the dam.
          2. Any such person obtaining or possessing such a permit shall:
7                   (a) Before constructing, reconstructing or altering in any way any dam,
                  notify the State Engineer thereof; and
8                   (b) Where the dam is or will be 20 feet or more in height, measured from
                  the downstream toe to the crest of the dam, or is less than 20 feet in height
9                   and will impound more than 20 acre-feet of water, submit to the State
                  Engineer in triplicate plans and specifications thereof for approval 30 days
10                  before construction is to begin.
          3. The State Engineer shall examine such plans and specifications and if the State
11         Engineer approves them the State Engineer shall return one copy with such
          approval to the applicant. If the State Engineer disapproves any part of the plans
12         and specifications the State Engineer shall return them to the applicant for
          correction or revision.
13         4. The construction and use of any dam is prohibited before approval of the plans
          and specifications by the State Engineer.
14         5. The State Engineer may at any time inspect or cause to be inspected the
          construction work while it is in progress to determine that it is being done in
15         accordance with the approved plans and specifications.
          6. This section applies to new construction, reconstruction and alteration of old
16         structures.
          7. The provisions of this section relating to approval of plans and specifications and
17         inspection of dams do not apply to works constructed by the United States Bureau
          of Reclamation or the United States Army Corps of Engineers; but such federal
18         agencies shall file duplicate plans and specifications with the State Engineer.
          8. Any person beginning the construction of any dam before approval of the plans
19         and specifications by the State Engineer, or without having given the State Engineer
          30 days' advance notice of any proposed change, reconstruction or alteration
20         thereof, is guilty of a misdemeanor. Each day of violation of this section constitutes
          a separate offense and is separately punishable.
21

22  Setting aside the fact that Union Pacific failed to plead this statute, the Court still finds it

23  inapplicable. Union Pacific argues that when Winecup modified the outlet pipes for the 23 Mile

24  dam in 1996 without submitting plans or specifications, that was a violation of this statute and

25  forms the basis of its claim. While this may have been a violation of the statute, it occurred nearly

26  20 years prior to the 2017 flood incident. The 2016 inspection report mentions that over the short

27  term (1 year), the "outlet should be exercised through its full range of motion at least twice per

28  year," and "[p]lans or other information should be submitted to this office to document the current

outlet controls, which may have been installed prior to 1995." The report makes no indication that Winecup violated this (or any other) statute nor does the record support that the Division of Water Resources ever sought to remedy a violation of this statute over the 20-year period. Accordingly, the Court finds any potential violation of this statute in 1996 is too far removed from the 2017 flood to form the basis of a negligence per se argument now.

Union Pacific further argues that Winecup "abandoned" the Dake dam which constitutes an "alteration" within the meaning of NRS § 535.010 and required Winecup to submit a plan for approval, which it failed to do. There is evidence within the record that in 2008 Winecup was considering breaching the Dake dam; the correspondence indicated that it was awaiting more information from the State Engineer and that an inspection of the dam occurred in February 2009. *See* ECF No. 155-4 at 5; ECF No. 155-5. But Union Pacific does not point to any evidence in the record of "abandonment." Nor has Union Pacific pointed to anything in the record to support that the State Engineer has considered legal action against Winecup under this statute for a violation due to abandonment of the Dake. The Court therefore finds that Union Pacific has failed to provide a statute upon which to argue negligence per se; Winecup's motion (ECF No. 149) is granted.

4. <u>Winecup's fourth motion in limine to exclude evidence and argument that Union Pacific is entitled to punitive damages (ECF No. 150) is denied without prejudice.</u>

Winecup's fourth motion in limine requests the Court exclude Union Pacific's claim of punitive damages. ECF No. 150. Under Nevada law, punitive damages are available in a negligence suit "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, express or implied[.]" NRS § 42.005(1). While ultimately whether to award punitive damages is a question for the jury, the district court must first make a "threshold determination that a defendant's conduct is subject to this form of civil punishment." *Countrywide Home Loans, Inc. v. Thitchener*, 192 P.3d 243, 252-53 (Nev 2008) (citing *Evans v. Dean Witter Reynolds, Inc.*, 5 P.3d 1043, 1052 (2000)). The following definitions are relevant to making this determination: (1) oppression means "despicable conduct that subjects a person to cruel and unjust hardship with conscious disregard of the rights of the person"; (2) fraud means "intentional misrepresentation, deception or concealment of a material fact known to the person

with the intent to deprive another person of his or her rights or property or to otherwise injure another person"; (3) malice, express or implied, means "conduct which is intended to injure a person or despicable conduct which is engaged in with a conscious disregard of the rights or safety of others"; and (4) conscious disregard means "the knowledge of the probable and harmful consequences of a wrongful act and a willful and deliberative failure to act to avoid these consequences." NRS § 42.001(1)-(4). Section 42.001(1) "plainly requires evidence that a defendant acted with a culpable state of mind," and the defendant's conduct "at a minimum, must exceed mere recklessness or gross negligence." *Thitchener*, 192 P.3d at 255.

Union Pacific does not allege a claim for gross negligence, but simply makes a claim for negligence. *See* ECF No. 89. Following the Nevada Supreme Court in *Thitchener*, as a matter of law, a plaintiff is not entitled to pursue punitive damages on negligence claims. *See Madrigal v Treasure Island Corp.*, Case No. 2:08-CV-01243-PMP-GWF, 2008 WL 11389168, at *5 (D. Nev. Dec. 30, 2008) ("Because punitive damages are not available for negligence claims, Plaintiffs are not entitled to pursue punitive damages for the negligence, negligent hiring, and negligent misrepresentation claims."). However, Union Pacific may qualify for punitive damages for its claims of trespass and nuisance. *See Land Baron Ivs., Inc. v. Bonnie Springs Family LP*, 356 P.3d 511, 522 (Nev. 2015) (affirming an award of punitive damages for a nuisance counterclaim); *Parkinson v. Winniman*, 344 P.2d 677, 678 (Nev. 1959) (holding that an award of exemplary damages was proper upon proof of intentional trespass).

A reasonable jury could find punitive damages are warranted if it finds that Winecup acted with conscious disregard of the downstream property owners. The record supports that Winecup had policies and procedures[12] for monitoring and inspecting the dams, including the water level, inflow, and operational controls. ECF No. 157-2 at 10-15, 26, 30, 52. However, there is also evidence in the record that DWR instructed Winecup to complete specific tasks that were not done: The 1996 inspection report for 23 Mile dam indicates that the "wing walls at the downstream invert should have the concrete repaired," and this repair was again noted in the 2003 report. ECF Nos.

---

[12] *See Shaw v. CitiMortgage, Inc.*, 201 F.Supp.3d 1222, 1264 (D. Nev. 2016) (the company's serious lack of practices, policies and procedures to deal with and explain the company's positions and actions supported the Court's punitive damage award).

157-24, 157-28. The Court notes that this repair does not show up in either the 2012 or 2016 inspection report which would indicate the repair was made sometime between 2003 and 2012. Winecup did not undertake a program for investigation of the hydraulic adequacy of 23 Mile dam with respect to flood and seeping under a full hydraulic head, admittedly a safety concern, as noted in the 2003 inspection report under long term actions (3 years). ECF Nos. 157-2 at 66; 157-28. Continued monitoring of the seepage area is noted in both the 2012 and 2016 reports. *See* ECF Nos. 157-31; 157-32. In 1996, DWR indicated that it appeared that new hydraulic controls were presented, and that plans and specifications for these plans needed to be submitted. ECF No. 157-24 at 3-4. This short-term action was again noted in the 2016 inspection report which would indicate that Winecup had failed to provide these plans for 20 years. ECF 157-32 at 2. In 1996, the inspection report provided that the spillway appeared undersized. ECF No. 157-24 at 4. In the 2012 inspection report, it is noted that the spillway should be cleared of all debris and vegetation, however, in 2016, the inspection report provides that the spillway has lost its design capacity due to vegetation growing and earthen materials sluffing from the hillside. ECF Nos. 157-31; 157-32. While 23 Mile dam is classified as a low hazard dam, meaning it carries a "very low probability of causing a loss of human life;" and a "reasonable probability of causing little, if any, economic loss or disruption in a lifeline," that does not negate a dam owner's statutory mandate to perform "work necessary to maintenance and operation which will safeguard life and property."[13] Given these facts, a jury could reasonably find that a failure to complete safety measures as directed by the DWR over approximately 20 years constituted conscious disregard. Accordingly, Union Pacific has made a threshold showing which could support punitive damages; Winecup's fourth motion in limine is denied without prejudice.[14]

> 5.  Winecup's fifth motion in limine to exclude evidence and argument related to an Emergency Action Plan for the Dake dam (ECF No. 151) is denied without prejudice.

Winecup argues that because the Dake dam did not fail or overtop, whether Winecup failed to submit an emergency action plan for the dam, as all significant hazard dam owners are required

---

[13] NAC § 535.140; NRS § 535.030.
[14] Winecup may motion the Court to reconsider this determination based on the evidence presented at trial.

to do under NAC § 535.320, is irrelevant—there can be no causal connection between Union Pacific's injury and Winecup's failure to submit the plan. ECF No. 151. Union Pacific argues that the Dake dam's inoperable outlet and failed embankment section near the spillway intensified the flood waters and contributed to the damage to Union Pacific's tracks, and had an emergency action plan been in place, these inadequacies would have been addressed. ECF No. 156. The Court finds that whether such evidence is relevant is best determined at trial. The Court therefore denies Winecup's fifth motion in limine without prejudice and reserves ruling on such evidence until it can be adjudged in the context of trial.

> 6. Winecup's sixth motion in limine to exclude evidence and argument related to the financial condition of Winecup, Paul Fireman, and the sale of Winecup Gamble Ranch in 2019 (ECF No. 152) is granted in part and denied in part.

In Winecup's sixth and final motion in limine, it motions the Court to exclude evidence and argument related to the financial condition of Winecup, Paul Fireman, or the sale of Winecup Gamble Ranch in 2019, as it is irrelevant and would be unfairly prejudicial. ECF No. 152. Union Pacific provides that it does not intend to proffer any evidence related to non-party Paul Fireman. ECF No. 157. Union Pacific further argues that evidence of Winecup's financial condition is "to allow the jury to fully evaluate the decades of neglect, to see it was not due to financial straits but was fully calculated and intentional with an eye to profits." *Id.*

It is clear to the Court based on this argument that Union Pacific intends to offer the financial information as it relates to punitive damages. Pursuant to Nevada Revised Statutes § 42.005(4), "[e]vidence of the financial condition of the defendant is not admissible for the purpose of determining the amount of punitive damages to be assessed until the commencement of the subsequent proceeding to determine the amount of exemplary or punitive damages to be assessed." That means, under Nevada law, punitive damages proceedings are bifurcated. *See Wyeth v. Rowatt*, 244 P.3d 765, 775 (Nev. 2010). During the initial proceeding, the jury will decide whether Winecup acted with oppression, fraud, or malice. If the jury finds in the affirmative, a subsequent proceeding will occur during which the parties will be permitted to present evidence of the financial condition of the defendant and the jury could award punitive damages. Until that secondary proceeding, Union Pacific is precluded from introducing evidence related to Winecup's

financial situation or the sale of the Winecup ranch; Winecup's sixth motion is granted in part and denied in part.

**IV.    CONCLUSIONS**

IT IS THEREFORE ORDERED that Union Pacific's first motion in limine to exclude meteorological opinions of Matthew Lindon and to appoint a neutral expert (ECF No. 111) is **DENIED.**

IT IS FURTHER ORDERED that Union Pacific's second motion in limine to exclude hydrological opinions of Matthew Lindon and to appoint a neutral expert (ECF No. 112) is **DENIED**.

IT IS FURTHER ORDERED that Union Pacific's third motion in limine to facilitate efficient management of exhibits and testimony (ECF No. 122) is **GRANTED in part** and **DENIED in part** in accordance with this Order.

IT IS FURTHER ORDERED that Union Pacific's fourth motion in limine to pre-admit exhibits for use in juror binders (ECF No. 123) is **DENIED**. The parties are encouraged and permitted to file a stipulation requesting pre-admittance of any uncontested exhibits.

IT IS FURTHER ORDERED that Union Pacific's fifth and sixth motions in limine to Bar Two Opinions of Derek Godwin (ECF No. 139) is **DENIED.** Winecup may submit a response to Union Pacific's reply regarding the standard to be used for damages, within **14 days** of the filing of this Order. Briefing is not to exceed **15 pages of argument**, excluding tables of contents and authorities and administrative notices. No other issues will be entertained without leave of the Court.

IT IS FURTHER ORDERED that Union Pacific's seventh motion in limine to bar Winecup's contributory negligence defense and Derek Godwin's contributory negligence opinion (ECF No. 124) is **DENIED**.

IT IS FURTHER ORDERED that Union Pacific's eighth motion in limine to bar evidence or argument that a non-party is comparatively negligent (ECF No. 125) is **GRANTED in part and DENIED in part**, in accordance with this Order.

///

44

IT IS FURTHER ORDERED that Union Pacific's ninth motion in limine to bar mention to jury of notion that Nevada's dam statutes and regulations do not apply to the Winecup dams due to their age (ECF No. 126) is **DENIED**.

IT IS FURTHER ORDERED that Union Pacific's tenth motion in limine requesting that the Court instruct the jury before trial about certain laws that apply to Nevada dam owners (ECF No. 127) is **DENIED**.

IT IS FURTHER ORDERED that Union Pacific's eleventh motion in limine to bar Rule 702 opinions (A) generally, if not in expert reports, and (B) specifically, from Luke Opperman (ECF No. 128), and Union Pacific's related nineteenth motion in limine to preclude experts disclosed on May 13, 2020 (ECF No. 175), are **DENIED without prejudice**

IT IS FURTHER ORDERED that Union Pacific's twelfth motion in limine to Bar Evidence or Argument about (A) the Oroville Dam Spillway Failure, or (B) Weather or (C) Flood Conditions in Watersheds West of the Relevant One (ECF No. 129) is **DENIED without prejudice**.

IT IS FURTHER ORDERED that Union Pacific's thirteenth motion in limine to bar evidence or argument related to an "Act of God" defense (ECF No. 130) is **DENIED without prejudice**.

IT IS FURTHER ORDERED that Union Pacific's fourteenth motion in limine to bar evidence or argument about consulting experts (ECF No. 131) is **DENIED without prejudice**.

IT IS FURTHER ORDERED that Union Pacific's fifteenth motion in limine to bar one paragraph in an email referencing contract truck driver incidents (ECF No. 132) is **GRANTED**.

IT IS FURTHER ORDERED that Union Pacific's sixteenth motion in limine to bar two words in an email with profane reference (ECF No. 133) is **DENIED without prejudice**.

IT IS FURTHER ORDERED that Union Pacific's seventeenth motion in limine to bar Winecup from providing trial testimony that contradicts its Rule 30(b)(6) witness's deposition testimony (ECF No. 134) is **DENIED without prejudice**.

IT IS FURTHER ORDERED that Union Pacific's eighteenth motion in limine to bar Winecup from offering evidence or argument about preserving the Dake dam for pike (ECF No. 135) is **DENIED in part** and **GRANTED in part**.

IT IS FURTHER ORDERED that Union Pacific's twentieth motion in limine to permit Union Pacific witnesses to testify by video (ECF No. 176) is **GRANTED**. The Court reiterates that is open to presiding over a bench trial via ZOOM video conferencing if the parties are amendable to such a solution. In that case, participating attorneys would appear in-person, and the Court would leave it to each party's counsel to determine which of its witnesses would appear by video or in-person. If the parties determine that a jury trial is necessary, the Court would expect the participating attorneys to appear in-person, but it would again leave it to each party's counsel to determine which of its witnesses would appear by video or in-person. The Court notes that it is open to hearing any other mutually agreeable alternative to the options suggested by the Court as this case proceeds.

IT IS FURTHER ORDERED that Winecup's first motion in limine to exclude Daryoush Razavian's testimony related to mile post 670.03 (ECF No. 141) is **DENIED**.

IT IS FURTHER ORDERED that Winecup's second motion in limine to exclude evidence and argument that NAC § 535.240 applies to the 23 Mile and Dake dams (ECF No. 143) is **DENIED**.

IT IS FURTHER ORDERED that Winecup's third motion in limine to exclude argument related to Union Pacific's claim for negligence per se (ECF No. 149) is **GRANTED**.

IT IS FURTHER ORDERED that Winecup's fourth motion in limine to exclude evidence and argument that Union Pacific is entitled to punitive damages (ECF No. 150) is **DENIED without prejudice**.

IT IS FURTHER ORDERED that Winecup's fifth motion in limine to exclude evidence and argument related to an Emergency Action Plan for the Dake Dam (ECF No. 151) is **DENIED without prejudice**.

IT IS FURTHER ORDERED that Winecup's sixth motion in limine to exclude evidence and argument related to the financial condition of Winecup, Paul Fireman, and the sale of Winecup Gamble Ranch in 2019 (ECF No. 152) is **GRANTED in part and denied in part.**

///

///

IT IS FURTHER ORDERED that Union Pacific's twenty-first motion in limine to amend the Pretrial Order (ECF No. 193) is **GRANTED in part and DENIED in part** in accordance with this Order.

IT IS FURTHER ORDERED that Union Pacific's motion to seal (ECF No. 142) is **GRANTED,** as exhibits 10 and 11 contain information Union Pacific has marked "Confidential" under the Court's April 17, 2018 protective order and the request to seal is unopposed by Winecup.

IT IS FURTHER ORDERED that the parties are to submit an amended pretrial order within **45 days** of the filing of this Order. The amended order should include both the agreed amendments and those permitted by this Order. The Court reiterates that the District Court has temporarily suspended all jury trials until further notice. *See* General Order 2020-03. While the Court expects in-person jury trials to resume in early 2021, the parties should consider the constraints of holding a civil jury trial during the COVID-19 pandemic as they proceed with the litigation of this matter and in determining whether a bench trial via ZOOM video conferencing is a feasible option.

IT IS SO ORDERED.

DATED this 4th day of December, 2020.

LARRY R. HICKS
UNITED STATES DISTRICT JUDGE