1

2

3

4

5

6

7

8

9

10

11

12

13

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

UNION PACIFIC RAILROAD COMPANY, a Delaware corporation,

Plaintiff,

v.

WINECUP GAMBLE, INC., a Nevada corporation,

Defendant.

Case No. 3:17-cv-00477-LRH-CLB

ORDER

14      Before the Court is Union Pacific's motion for judgment as a matter of law or alternatively

15  a new trial (ECF No. 303). Union Pacific primarily asserts that judgment as a matter of law or a

16  new trial should be granted because Winecup Gamble's two experts were unqualified under

17  Federal Rule of Civil Procedure 702 and they both offered undisclosed opinions. Union Pacific

18  also asserts a variety of miscellaneous arguments to support the granting of a new trial. After

19  extensive review of the parties' briefs, the trial transcripts, and the Court's numerous orders

20  addressing several of the issues presented in this motion, the Court remains of the firm opinion

21  that the jury's verdict should stand. Neither Union Pacific's arguments about Winecup Gamble's

22  experts or the miscellaneous arguments have any merit. Accordingly, the Court denies Union

23  Pacific's motion.

24  **I.      BACKGROUND**

25      In September 2022, the Court conducted a ten-day jury trial to resolve this dispute

26  regarding damages caused by massive storms and flooding in northeast Nevada in February of

27  2017. The claims at issue were Union Pacific's (1) negligence claim, alleging that Winecup

28  Gamble's negligence caused the railway damage that occurred during the 2017 flood at railroad

1

1    mile posts 670, 672, 677, and 679; (2) trespass claim, alleging that Winecup Gamble trespassed at

2    those mile posts; and (3) private nuisance claim, alleging that Winecup Gamble is liable for a

3    private nuisance at those mile posts.  Winecup Gamble disclaimed any negligence, trespass, or

4    private nuisance and also asserted affirmative defenses that the 2017 flood was an Act of Nature

5    or Act of God and that Winecup Gamble was not responsible for Union Pacific's flood related

6    damages.

7          After ten days of testimony from numerous witnesses, including experts presented by both

8    sides, and closing arguments, the case was submitted to the jury.  Upon completion of deliberation,

9    the jury found in favor of Winecup Gamble.  Specifically, the jury found that (1) Union Pacific

10   had not proven that Winecup Gamble's negligence caused the damage that occurred at mile posts

11   670, 672, 677, and 679; (2) Union Pacific had not proven that Winecup Gamble was liable for

12   trespass at those mile posts; and (3) Union Pacific had not proven that Winecup Gamble was liable

13   for a private nuisance at those mile posts.  ECF No. 282.  The jury also found that Winecup Gamble

14   had proven its affirmative defense that the 2017 flood was an Act of Nature or Act of God.  *Id.*

15   Accordingly, the jury did not reach the issue of damages.  *Id.*

16         Following the trial, Union Pacific filed the motion before the Court today, a motion for

17   judgment as a matter of law or alternatively a new trial.

18   **II.     LEGAL STANDARD**

19         **A.     Federal Rule of Civil Procedure 50: Judgment as a Matter of Law**

20         After the Court enters judgment, a party may file a renewed motion for judgment as a

21   matter of law under Rule 50, which provides that judgment as a matter of law is appropriate if "a

22   reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that

23   issue."  Fed. R. Civ. P. 50(a)(1), (b).  In other words, Rule 50 "allows the trial court to remove

24   cases or issues from the jury's consideration when the facts are sufficiently clear that the law

25   requires a particular result."  *Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000).

26         To determine whether the renewed Rule 50 motion should be granted, the Court reviews

27   the record to determine whether "substantial evidence" supports the jury's verdict.  *See Hagen v.*

28   *City of Eugene*, 736 F.3d 1251, 1256 (9th Cir. 2013).  "A jury's verdict *must* be upheld if it is

1   supported by substantial evidence which is evidence adequate to support the jury's conclusion,

2   even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th

3   Cir. 2002) (emphasis added).   A verdict is not supported by substantial evidence "when the

4   evidence, construed in the light most favorable to the nonmoving party, permits only one

5   reasonable conclusion, which is contrary to the jury's verdict."   *Hagen*, 736 F.3d at 1256.   In

6   reviewing a Rule 50 motion, the Court "must disregard evidence favorable to the moving party

7   that the jury is not required to believe," "must view the evidence in the light most favorable to the

8   nonmoving party," and must "draw all reasonable inferences in [the non-moving] party's favor."

9   *Pavao*, 307 F.3d at 918; *see also Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276,

10  1283 (9th Cir. 2001) ("[T]he court is not to make credibility determinations or weigh the evidence

11  and should view all inferences in the light most favorable to the nonmoving party.").

12          "Given the sanctity of the jury process, [the Court] undertake[s] this review with special

13  care and reluctance to overturn a verdict."   *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 736 (9th

14  Cir. 2019).   The party moving for judgment as a matter of law bears a "very high" burden" that

15  "recognizes that credibility, inferences, and factfinding are the province of the jury," and are not

16  for the Court to assume.   *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 859 (9th Cir. 2002).

17          **B.      Federal Rule of Civil Procedure 59: New Trial**

18          Under Rule 59, the Court may grant a motion for a new trial after a jury trial for any reason

19  for which a new trial has previously been granted in federal court.   Fed. R. Civ. P. 59(a)(1)(A).

20  These reasons include (1) correcting manifest errors of law or fact; (2) newly discovered evidence;

21  (3) to prevent manifest injustice; and (4) an intervening change in controlling or governing law.

22  *See Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011).   If a party seeks a new trial

23  on the basis that an erroneous evidentiary ruling occurred, a "new trial is only warranted when an

24  erroneous evidentiary ruling 'substantially prejudiced' a party."   *Ruvalcaba v. City of Los Angeles*,

25  64 F.3d 1323, 1328 (9th Cir. 1995) (quoting *United States v. 99.66 Acres of Land*, 970 F.2d 651,

26  658 (9th Cir. 1992)).   Similarly, if the party seeks a new trial on the basis of an erroneous jury

27  instruction, the instruction must have resulted in prejudicial error.   *See Swinton v. Potomac Corp.*,

28  270 F.3d 794, 802 (9th Cir. 2001).   Prejudicial error occurs "when, looking to the instructions as

1    a whole, the substance of the applicable law was not fairly and correctly covered." *Id.* Under this

2    standard, "[a] district court may not grant a new trial simply because it would have arrived at a

3    different verdict." *Wallace v. City of San Diego*, 479 F.3d 616, 630 (alterations omitted) (quoting

4    *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001). The

5    moving party bears a high burden and the Court does not take lightly disturbing a plausible jury

6    verdict.

7        **C.    Expert Witness**

8        Rule 702 governs the admissibly of expert testimony, providing:

9        A witness who is qualified as an expert by knowledge, skill, experience, training,
         or education may testify in the form of an opinion or otherwise if: (a) the expert's
10       scientific, technical, or other specialized knowledge will help the trier of fact to
         understand the evidence or to determine a fact in issue; (b) the testimony is based
11       on sufficient facts or data; (c) the testimony is the product of reliable principles and
         methods; and (d) the expert has reliably applied the principles and methods to the
12       facts of the case.

13   Fed R. Evid. 702. Expert testimony must be relevant to the task at hand and rest on a reliable

14   foundation. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). "Expert

15   opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent

16   inquiry." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (internal quotation marks and

17   citations omitted).

18       To determine the reliability of the principles and methods used, the court looks to:

19   (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to

20   peer review and publication; (3) the known or potential rate of error; (4) whether there are

21   standards controlling the technique's operation; and (5) whether the theory or technique has

22   general acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 592–94.

23   "These factors are 'meant to be helpful, not definitive, and the trial court has discretion to decide

24   how to test an expert's reliability as well as whether the testimony is reliable, based on the

25   particular circumstances of the particular case.'" *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,

26   752 F.3d 807, 814 (9th Cir. 2014) (quoting *Primiano*, 598 F.3d at 564). In some circumstances,

27   conducting a *Daubert* hearing may be helpful to make this determination, but "*Daubert* hearings

28   are not required." *United States v. Holguin*, 51 F.4th 841, 852 (9th Cir. 2022).

1    The Court's "inquiry into admissibility is a flexible one," in which the Court acts only as

2    a gatekeeper, not a factfinder.  *Id.* at 813 (internal quotation marks and citations omitted).  The

3    Court's role is to "screen the jury from unreliable nonsense opinions, … not exclude opinions

4    merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738

5    F.3d 960, 969 (9th Cir. 2013) (internal quotation marks and citations omitted).  The Court has

6    broad discretion when discharging its gatekeeping function.  *Hangarter v. Provident Life &*

7    *Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004).

8    **III.    DISCUSSION**

9        **A.    Union Pacific is not entitled to judgment as a matter of law.**

10    Union Pacific asserts that it should be granted judgment as a matter of law primarily

11   because it believes that Winecup Gamble's exerts did not satisfy Rule 702 and that they testified

12   to undisclosed opinions.  As the Court explains below, none of these arguments have merit.

13           1.    <u>Matthew Lindon</u>

14    Winecup Gamble called Matthew Lindon as an expert on hydrology and meteorology

15   issues.  Before trial, Union Pacific challenged Lindon's qualifications in a motion in limine.  The

16   Court ruled that Lindon was qualified as to both hydrology and meteorology issues under Rule

17   702. *See* ECF No. 198 at 3–9.  Union Pacific challenged Lindon's qualifications at trial, and now,

18   once again, claims that Lindon was an unqualified expert and that several of his opinions were

19   inadmissible because they were undisclosed.  As explained below, the Court remains convinced

20   that Lindon was a qualified expert and that his opinions were admissible.

21                *i.    Lindon satisfied the Rule 702 requirements for expert witnesses.*

22    For essentially the same reasons that were raised in its motions in limine, Union Pacific

23   claims that Lindon does not satisfy the Rule 702 requirements for expert testimony on

24   meteorological issues.  Although some details may be different, Union Pacific presents no new

25   material arguments. *Compare, e.g.*, ECF No. 111 at 16 (alleging Lindon's testimony should be

26   excluded because he was not a meteorologist), *with* ECF No. 265 at 5–6 (same), *with* ECF No. 303

27   at 11–12 (same).  The new details that Union Pacific raises do not change the result of the Court's

28

decision in its December 2020 order and its trial ruling that Lindon is a qualified expert in both hydrology and meteorology.[1]

As to Lindon's qualifications as an expert witness on meteorological issues, the Court previously explained that Lindon's knowledge, skill, experience, education, and training qualify him as an expert. ECF No. 198 at 5. Lindon had created "hydrological models to simulate hypothetical storms and floods and recreate actual events, such as rain on snowpack events, that resulted in flooding and dam failures." *Id.* (quoting ECF No. 120-1 at 3). He had "significant experience with hydrometeorology, surface water, hydrology, modeling, and dam safety hydrology." *Id.* (quoting ECF No. 120-1 at 3). In addition, through his work as a hydrologist, he regularly encountered and worked with precipitation data. *Id.* (citing ECF No. 120-1 at 4). He received formal training on that topic and took continuing education courses in hydro-meteorology. *Id.* And he taught a graduate level course that included water management and hydrometeorology. *Id.* Although Lindon did not have a meteorology degree, he was clearly qualified to conduct meteorological calculations and to consider those calculations in reaching his expert opinion about the dam failure and subsequent flooding. *Id.*; *see also* ECF No. 120 at 8–10 (providing a summary of Lindon's qualifications). These qualifications were confirmed and further emphasized by Lindon's testimony at trial. *See, e.g.*, Tr. at 1440–44, 1453–55, 1466–70, 1478–79, 1490–1500, 1635, 1744–46.

In addition to his experience in meteorology, Lindon's methodology was relevant and his testimony was reliable. As the Court previously explained, his testimony was relevant to issues such as the standard of care for dams and whether Winecup acted reasonably. ECF No. 198 at 6–7. It was also reliable. *Id.* The hydrological model that Lindon used was the industry standard model and was generally accepted in the scientific community. *Id.* at 5–7. He used data from the U.S. Geological Survey stream gages and National Weather Service stations to form the model

---

[1] Union Pacific claims that it was prevented from offering evidence on admissibility of Lindon's and Godwin's testimony. No such thing occurred. At trial, Union Pacific attempted to question one of its experts on Lindon's Rule 702 qualifications and have him opine on whether he satisfied them. Tr. at 483–84. The Court prohibited this, recognizing that Union Pacific was inquiring into the legal determination that is left up to the Court to decide. Tr. at 484. But at no point did the Court prevent Union Pacific from conducting a voir dire of Lindon or Godwin at the trial.

1    and calibrate his results.  And he checked and calibrated the model, concluding with a "high degree

2    of confidence that the model accurately reflects" the February 2017 flood event.  *Id.*

3           Moreover, the issues Union Pacific raised in its motions in limine, and raises again in this

4    motion, ask the Court to conflate the question of admissibility with the weight to be given to the

5    testimony by considering the persuasiveness of competing scientific methods.  *Id.* at 7–8.  The fact

6    that two experts may disagree does not make one of the experts unreliable.  Answering the question

7    of which expert is more persuasive is left to the jury to decide.  *Humetrix, Inc. v. Gemplus S.C.A.*,

8    268 F.3d 910, 919 (9th Cir. 2001).

9           Thus, the Court holds, once again, that Lindon satisfies the Rule 702 requirements.  He is

10   a qualified expert witness in both hydrology and meteorology.

11                          *ii.        All Lindon's testimony was properly admitted into evidence.*

12          In its challenge to Lindon's expert testimony, Union Pacific claims that ten opinions

13   Lindon expressed must be excluded because they were not disclosed before trial.  As explained

14   below, the ten opinions Union Pacific identifies were disclosed before trial and/or were proper

15   rebuttal testimony.  The Court did not err by admitting them during the trial, and none of them

16   warrant judgment as a matter of law (or, as explained below, a new trial).

17                          a)        Lindon disclosed that his opinion that the 2017 event was
                                      more than a 100-year event.
18

19          Union Pacific first claims that Lindon's testimony regarding the size of the 2017 flood was

20   undisclosed before trial.  ECF No. 303 at 19.  Specifically, it claims that Lindon did not disclose

21   that he believed that the event was a 500-year event or more than a 1,000-year event.  *Id.*  As the

22   Court previously recognized, Lindon disclosed in his expert report that his opinion was that the

23   flood was greater than a 100-year event.  EFF No. 198 at 6; ECF No. 111-29 at 16.  At trial, Lindon

24   explained that as he analyzed relevant data, the numbers that were coming up exceeded a 100-year

25   event by a great amount.  *Id.* at 1585–6.  He looked at 500-to-1,000-year events to see if the storm

26   could be classified as one of those.  *Id.*  Ultimately, however, Lindon concluded that the flood was

27   more than a 100-year event.  *Id.*  Lindon did not take the position that the flood should be classified

28   as a 500- or 1,000-year event.  *Id.*  Rather, he remained consistent with his previously disclosed

1 opinion that the flood was more than a 100-year event.  Moreover, Lindon disclosed in his report

2 the basis for his opinion, including that he considered data from a number of sources, such as

3 Salmon Falls Creek.  *See, e.g.*, ECF No. 111-29 at 6–7, 34.  Thus, the Court finds that Lindon did

4 not testify to any undisclosed opinions regarding the classification of the flood as more than a 100-

5 year event.

          b)        Lindon's testimony regarding the use of airplanes at certain
6                           weather stations was both disclosed and proper rebuttal
7                           evidence.

8         Union Pacific claims that Lindon had not disclosed that his reliance on data from the Arthur

9 weather station was justified by weather airplanes that flew over Nevada and shot gamma rays at

10 the ground.  ECF No. 303 at 19.  As an initial matter, Union Pacific's description of Lindon's

11 testimony is a mischaracterization.  Lindon did testify that airplanes fly over different areas of the

12 state to determine the depth of snowpack, but he explicitly stated that his opinion did not rest on

13 whether this occurred at the Arthur weather station.  Tr. at 1640–41.  Regardless, it was not

14 improper for Lindon to testify to aerial surveys being used to gather relevant data.  In his expert

15 report, Lindon disclosed that he considered several weather stations when utilizing the model to

16 determine accurate predictions of snowmelt.  His testimony at trial merely elaborated on the

17 context of the selection of the stations and was also a response to the criticism that Union Pacific's

18 expert provided regarding Lindon's choice of weather stations, including Arthur.  Tr. at 453–60,

19 464–81.  Thus, Lindon's testimony regarding the collection of data was both disclosed and proper

20 rebuttal evidence.

21           c)        Lindon's testimony regarding the Arthur weather station
22                         being an outlier was properly admitted.

23         Union Pacific claims that Lindon improperly testified that the Arthur weather station was

24 an outlier because this theory was not disclosed and an opinion that relies exclusively on outlier

25 data is unreliable.  ECF No. 303 at 20.  As discussed above, Lindon disclosed the weather stations

26 that he considered in running the model to predict snowmelt, which Union Pacific's expert

27 criticized during his trial testimony, including Lindon's use of the Arthur weather station.  Like

28 his testimony regarding the use of airplanes, Lindon's testimony regarding the nature of the Arthur

weather station as an outlier was a mere elaboration on how and why certain weather stations were chosen.  Moreover, his testimony was a direct response to Union Pacific's expert's criticism of the Arthur weather station.  Tr. at 468–75; 1476–77.  Lindon directly responded to Union Pacific's expert's opinion that the Arthur weather station should be excluded because it is an outlier.  It was not improper for Lindon to do so.  In addition, Lindon did not rely exclusively on the Arthur weather station data to conduct the model.  *See, e.g.*, ECF No. 120-1 at 6–7 ("I used data from both the Arthur gage and the Rock Springs gage, as the Arthur gage represents the average elevation of the Thousand Springs Creek drainage basin, and the Rock Springs gage is the closest gage to the drainage.").  Union Pacific's claim otherwise is thus misplaced.  Essentially, this was nothing more than disagreement between qualified experts.

> d) Lindon disclosed in his rebuttal report that he disagreed with Razavian's curve number because it was "very high."

Union Pacific claims that Lindon failed to disclose his criticism of Razavian's opinion that the appropriate curve number to use in the SCS Curve Number method was 82.  ECF No. 303 at 20.  In his rebuttal report, Lindon criticized Razavian's use of the curve number of 82.  ECF No. 111-34 at 12.  He explained that this number is "very high," and said that it is "suitable for slick rock or parking lots and derive[s] from worst case soil conditions, to produce very high runoff flood peaks and volumes."  *Id.* at 12–13.  At trial, Lindon elaborated on why that number was "very high" and what a more acceptable curve number would be.  Tr. at 1495–96.  This elaboration was related to a disclosed opinion and was also offered by Lindon in rebuttal to Razavian's trial testimony.  *See* Tr. at 832–36; 1495–96.  Once again, this simply consisted of competing differences between qualified experts.

> e) Lindon disclosed his opinion that ice blocks could have formed in ponding areas around Loray Wash.

Union Pacific claims that Lindon failed to disclose his opinion on ice blocks.  ECF No. 303 at 20–21.  This argument is contrary to the record.

Union Pacific's expert, Razavian, first disclosed his opinion regarding ice blocks in a motion in limine.  ECF No. 112-7 at 8–9.  He claimed that ice cannot form on fast moving water

1    and implied that ice blocks had to travel from the 21-Mile Reservoir instead of forming in the

2    Loray Wash.  *Id.*  In response, Lindon provided a declaration stating that "the elevation of the

3    Loray Wash hardly rises to the west of 670.03 and it contains ponding areas *where ice formation*

4    *is likely.*"  ECF No. 141-2 at 8 (emphasis added).  Both Razavian and Lindon elaborated on their

5    opinions regarding the ice blocks during trial.  Through its witnesses, including Razavian, Union

6    Pacific emphasized the importance of the ice blocks during the events of the 2017 flood and

7    claimed that the ice could not have formed in the Loray Wash.  Tr. at 605, 652, 700–03, 762–63.

8    Lindon later testified that, in his opinion, it was more probable that the ice formed locally in the

9    ponding areas of the Loray Wash throughout the winter than it forming elsewhere and being

10   transported a long way to the Loray Wash.  Tr. 1528.

11        Although Lindon did not explicitly state these opinions in his declaration, they appear to

12   be a mere elaboration of his disclosed opinion.  Lindon had previously disagreed with Razavian

13   regarding whether ice blocks could form in Loray Wash and then explained his disagreement more

14   specifically during trial.  At a minimum, however, Lindon's testimony was offered as a rebuttal

15   response to the information that Razavian testified to when Union Pacific presented its case.  This

16   was proper expert testimony during trial.

17                                    f)    Lindon's opinion that the Nevada Department of
                                          Transportation was a cause of damages was disclosed before
18                                        trial.

19

20        Union Pacific claims that Lindon did not disclose that his opinion that the Nevada

21   Department of Transportation was the proximate cause of all damages was premised on Exhibit

22   1648.  This claim cannot provide the basis for judgment as a matter of law or a new trial.  Because

23   the jury found that Union Pacific had failed to meet its burden to prove the elements of its

24   negligence claim, and that the flood was the product of an Act of Nature or an Act of God, the

25   flood was clearly the proximate cause of all damages.  The jury never reached the question of

26   proximate cause beyond the flood itself.  *See* ECF No. 282.  And if any error occurred regarding

27   the admission of this opinion, it is not more likely than not that the error affected the verdict.  *See,*

28   *e.g.*, *United States v. Tran*, 568 F.3d 1156, 1162 (9th Cir. 2009).

1    Moreover, even if the jury had reached this issue, Lindon's testimony at trial was

2    admissible because it was based on a disclosed opinion.  Lindon offered an opinion that the

3    highway played a causal role in the damages incurred.  He based his opinion on the latest version

4    of the U.S. Army Corps of Engineers program HEC-HMS, not Exhibit 1648 as Union Pacific

5    claims.  ECF No. 111-29 at 2.  This opinion was disclosed in his initial report.  In that report, he

6    explained that the flood had been attenuated by almost 85% when it reached the highway and

7    quickly overwhelmed the highway's undersized culverts.  *Id.*  This caused the highway to overtop

8    and washout and led to a much larger flood.  This flood from the highway breach, according to

9    Lindon, was the proximate cause of the Union Pacific's railway damage because the breach and

10   subsequent damage caused by the increased flood would have occurred without the breach of the

11   23-Mile Dam.  *Id.* at 14–15.  This disclosed opinion did not depend on Exhibit 1648.  Although

12   Lindon did discuss Exhibit 1648 at trial, he did not use it as the basis for his opinion in either his

13   report or his trial testimony.  *See* Tr. at 1570–80.  Thus, Lindon's opinion regarding the highway

14   being the proximate cause of the damage was properly admitted.  If negligence had been found by

15   the jury, the proximate cause of Union Pacific's damages would have been an issue.  However,

16   the jury found there was no negligence and therefore did not consider damages.

17              g)    Lindon's remarks on the inevitability of the failure of 23-
18                    Mile Dam were properly admitted into evidence.

19   Union Pacific claims that Lindon and Winecup Gamble misrepresented Razavian's

20   testimony regarding what events were inevitable in light of the volume of water flowing through

21   the area during the flood.  ECF No. 303 at 21.

22   During trial, Razavian testified that it was inevitable that the level of water in the Dake

23   Reservoir would rise to the level that the spillway was activated and water would flow through it.

24   Tr. at 879.  This was true regardless of the size of the spillway given the tremendous volume of

25   water that came out of the 23-Mile Dam and then went through the area and the Dake Reservoir.

26   Tr. 879–80.  Razavian agreed that this would cause the water to go to the highway where the

27   drainage from Loray Wash and Thousand Springs Creek meets the highway, inevitably leading to

28   the highway and portions of the railroad being washed out.  Tr. 879–81.

1    Lindon offered remarks to this testimony during his direct examination.  He agreed with

2    Razavian that it was inevitable that the water would flow downstream through the Dake Dam

3    spillway and cause the highway and railroad to wash out.  Tr. at 1578.  He also explained that this

4    result at the Dake Reservoir and areas past it would have occurred regardless of whether the

5    spillway at 23-Mile Dam was any bigger.  Tr. at 1579–80.  The combination of the peak flow and

6    the volume of water from this event made it inevitable.  *Id.*

7    Neither Lindon nor Winecup Gamble's counsel misrepresented Razavian's testimony.

8    Razavian's testimony regarding inevitability was read from a trial transcript to the jury, Lindon

9    commented on it, and then explained how his own opinion applied to 23-Mile Dam—regardless

10   of the size of the 23-Mile Dam spillway or the events that occurred there, the amount of water

11   flowing downstream was large enough that the same amount of damage would have occurred.

12   This opinion was entirely consistent with Lindon's causation opinion about the highway that was

13   disclosed in his report.  It was not a new opinion and was properly admitted into evidence during

14   the trial.

15                    h)    Lindon's opinion about the flow of water through the Loray
                           Wash was disclosed before trial.
16

17   Union Pacific claims that Lindon opined on an undisclosed opinion regarding the cause of

18   the flooding and washout of mile post 670.  ECF No. 303 at 21.  Lindon's testimony, however,

19   was consistent with his disclosed opinion.  Both parties' experts disclosed their opinions regarding

20   the cause of this washout through motion in limine briefing.  Lindon's declaration in that briefing

21   disclosed that he believed the washout at mile post 670 was caused by water from the Loray Wash.

22   ECF No. 141-2 at 4.  He explained that the natural course of the Loray Wash has two branches:

23   the north branch that is a straight, diversionary branch, and the south branch that is a natural,

24   meandering branch.  *Id.* at 6.  "[T]he flood followed the natural path of the Loray Wash that already

25   existed in 2016."  *Id.* at 7.  The culvert in place was not large enough for the expected flow at the

26   Loray Wash.  *Id.* at 8.  Lindon's testimony at trial was entirely consistent with this disclosure.  He

27   testified that the washout at mile post 670 was "caused by the Loray Wash and the abandonment

28

1    of a natural stream channel and a meander." Tr. at 1587.  Thus, Lindon did not offer an undisclosed

2    opinion at trial.

3                                   i)      Lindon's testimony regarding the inadequacy of the culverts
                                           was disclosed before trial.
4

5           Union Pacific's claim that Lindon's testimony regarding the inadequacy of the culverts

6    was not disclosed is belied by the record.  *See* ECF No. 303 at 21.[2]  In his expert report, Lindon

7    disclosed his opinion that the flow of water from the Dake spillway channel encountered several

8    culverts that were "entirely inadequate."  ECF No. 111-29 at 14.  This was evidenced by how

9    quickly the highway embankment overtopped, breached, and failed.  *Id.*  After the highway breach,

10   the flow enlarged and continued toward another downstream culvert spillway.  *Id.*  The flow,

11   however, overwhelmed the culvert and failed the railroad embankment.  *Id.*  The same happened

12   at the second and third railroad crossings that had a culvert and pipes to deal with the water

13   respectively.  *Id.* at 14–15.  Each "breached quickly, in series, like dominos."  *Id.* at 15.  Consistent

14   with this opinion, Lindon testified at trial that the cause of the washouts at mile posts 672, 677,

15   679, and Highway 233 was "a combination of high peak flows and large volumes involved in this

16   storm and the routing through inadequate conveyance facilities, outlets, and spillways."  Tr. at

17   1588.  Lindon did not testify regarding Union Pacific's duty of care in relation to the culverts, but

18   rather focused on how the culverts withstood the large volume of water rushing through the area.

19   This opinion was disclosed before trial and was therefore admissible.

20                                   j)      Lindon's testimony regarding Winecup hiring engineers and
                                           lawyers to specifically address dam safety was properly
21                                          admitted into evidence.

22          Union Pacific claims that Lindon improperly provided opinions based on the fact that

23   Winecup had hired engineers and lawyers to specifically address dam safety because they were

24   not previously disclosed.  ECF No. 303 at 21.  Union Pacific has identified no support in the record

25

26   _____
     [2] Specifically, Union Pacific claims that "Lindon testified that the flood was caused in part by undersized culverts."
     ECF No. 303 at 21.  Union Pacific's explicit claim is a mischaracterization of Lindon's testimony.  He did not testify
27   that the *flood* was caused by the undersized culverts.  Instead, he testified that the washouts were, in part, caused by
     inadequate channels.  *See* Tr. at 1588.  The heart of Union Pacific's claim seems to focus on Lindon's classification
28   of the culverts as inadequate.  Thus, the Court addresses above whether Lindon's opinion on the culverts' inadequacy
     was disclosed.

1    for this assertion.  The testimony that it cites as support is testimony Union Pacific elicited on

2    cross-examination by asking questions directly related to Winecup's hiring of engineers and

3    lawyers.  *See, e.g.*, Tr. 1605–09.  Union Pacific cannot now claim that Lindon provided improper

4    testimony when the testimony came as a direct result of its own questioning.  The door for this

5    testimony was opened on cross examination, not direct examination.  It was wholly proper for

6    Winecup to explore this issue on redirect as a result.  *See* Tr. 1737–42.

                                 *iii.        Conclusion*

8         As explained above, Lindon was a qualified expert, and all his trial testimony was

9    admissible.  Union Pacific has not identified any error in the Court's previous rulings that warrants

10   exclusion of Lindon's testimony.  The jury properly heard and relied on Lindon's testimony to

11   reach its verdict in favor of Winecup Gamble on all issues.  Moreover, the record strongly suggests

12   that even if Lindon's testimony was excluded, there is evidence supporting the jury's verdict based

13   on the cross-examination of Union Pacific's witnesses.  *See* ECF No. 309 at 12–16 (compiling

14   substantial evidence that supports judgment in favor of Winecup Gamble that does not include

15   Lindon's testimony).  Accordingly, the Court finds that the alleged errors relating to Lindon do

16   not warrant judgment as a matter of law in favor of Union Pacific.  The jury's verdict was

17   supported by substantial evidence.

18                    2.        Derek Godwin

19        Derek Godwin served as Winecup Gamble's expert on damages and contributory

20   negligence.  Union Pacific claims that Godwin does not satisfy the Rule 702 requirements and that

21   he testified to undisclosed opinions.  As Winecup Gamble correctly points out, the jury did not

22   reach the issues that Godwin's testimony pertained to.  Godwin testified only as to portions of

23   Union Pacific's claimed damages and contributory negligence.  The jury did not reach these issues

24   because Union Pacific failed to prove that Winecup Gamble was negligent, committed trespass, or

25   was liable for a private nuisance.  It is not more likely than not that any alleged error, if true,

26   affected the verdict.  Accordingly, they cannot serve as the basis for judgment as a matter of law

27   or a new trial.  *See, e.g.*, *Tran*, 568 F.3d at 1162.  Moreover, as explained below, the alleged errors

28   have no merit.

                                        *i.*        *Godwin satisfied the Rule 702 requirements for expert witnesses.*

Like Lindon, Godwin's expert testimony was challenged before trial in a motion in limine. The Court found that Godwin was a qualified expert who could opine on relevant topics and that he employed a reliable methodology. ECF No. 198 at 12–16. This time around, it is undisputed that Godwin is a qualified expert. The only challenge that Union Pacific raises relates to the reliability of the methodology that Godwin employed to determine whether Union Pacific was contributorily negligent. As an initial matter, 49 C.F.R. § 213.33 did not preempt the contributory negligence argument that Winecup advanced. *See* ECF No. 198 at 14–15. Further, Godwin's opinion on the standard that applied was based on his extensive experience with industry standards. *Id.* at 15–16. He utilized the RS Means methodology for calculating costs, an industry standard. And he considered the drainage area and peak flows for hypothetical storm events to determine whether Union Pacific was contributorily negligent for the damaged tracks; nothing in the record disputes that this was an appropriate methodology to do so. The Court finds that the methodology that Godwin employed was both appropriate and reliable. The arguments Union Pacific advanced to the contrary during the motion in limine stage and in its motion today go to the weight that should be given to Godwin's opinion, not whether it is admissible. *See, e.g.*, ECF No. 303 at 15–18. Thus, the Court finds that Godwin satisfied the Rule 702 requirements for expert testimony.

                                   *ii.*        *All Godwin's testimony was properly admitted into evidence.*

                                      *a)*        Godwin disclosed his opinion about the cost of equipment rentals and hauling costs.

Union Pacific first claims that Godwin failed to disclose his opinion regarding the cost of equipment rentals and hauling costs. ECF No. 303 at 22. Godwin's report exposes that Union Pacific's claim is without merit. In his report, Godwin included material relating to how he utilized the RS Means methodology. That material indicated that the costs of material, labor, and equipment were considered in the RS Means calculation, and it explicitly addressed hauling. *See* ECF No. 160-4 at 31–35. Thus, the Court properly admitted into evidence Godwin's opinion on the cost of equipment rentals and hauling costs. More importantly, this never became an issue for

1  the jury due to its conclusion that there was no negligence by Winecup Gamble and all flood

2  damages were due to an Act of Nature or Act of God.

3          b)      Godwin's testimony regarding construction costs was a
                   proper elaboration on his disclosed opinions.
4

5          Union Pacific lists several statements that Godwin made during trial regarding construction

6  costs that it believes were improper because they were not disclosed before trial.  Each of these

7  statements, however, were fully consistent with Godwin's opinion disclosure and did not include

8  any opinion that was not previously disclosed.  The statements he made were mere elaborations

9  on his cost estimates and explanations regarding why some things were not included in the

10 estimate.  This type of elaboration is to be expected and is fully consistent with Godwin's disclosed

11 opinions.

12         c)      Godwin's opinion regarding contributory negligence was
                   disclosed before trial.
13

14         Union Pacific's third claim is that Godwin offered new and unsupported arguments about

15 contributory negligence.  ECF No. 303 at 23.  Specifically, Union Pacific claims that he did not

16 disclose his opinion regarding the industry standard applying to existing culverts.  ECF No. 303 at

17 23.  In his report, Godwin stated that he employed a methodology that is the industry and

18 engineering standard.  ECF No. 160-4 at 2.  He explained during his deposition that, based on his

19 experience on the AREMA committee, the same standard generally applies to both existing and

20 new construction because the railroads make sure that existing structures meet the new standards.

21 *See* ECF No. 160-3 at 5–9.  He later declared that he believed the same standard of care for culvert

22 sizes applies to both new and existing structures.  ECF No. 160-6 at 4.  The opinion Godwin offered

23 during trial was consistent with this disclosure and thus was not a new, undisclosed, and

24 unsupported argument as Union Pacific claims.

25         d)      Godwin's testimony about using Google Earth to obtain
                   dimensions was proper.
26

27         Lastly, Union Pacific claims that it was error for Godwin to testify that he used Google

28 Earth to obtain one dimension for his trapezoid.  ECF No. 303 at 23.  Godwin did not explicitly

state in his report that he used Google Earth to obtain a dimension for the trapezoid.  He, however, did disclose the actual dimensions that he used for the trapezoid.  *See* ECF No. 160-4.  The fact that he used Google Earth to obtain the dimension was a mere elaboration of what he disclosed; it was not a new opinion.  Moreover, even if this opinion is considered undisclosed, there is no evidence that admission of this opinion substantially prejudiced Union Pacific.  *Cf. Ruvalcaba*, 64 F.3d at 1328 ("A new trial is warranted when an erroneous evidentiary ruling substantially prejudiced a party." (quotation omitted)).

Thus, Godwin was a qualified expert, and all his opinions were properly admitted into evidence.

### 3.    Conclusion

As explained above, both Lindon and Godwin were qualified experts who satisfied all Rule 702 requirements.  And their opinions offered at trial were properly admitted into evidence.  Therefore, none of the alleged errors Union Pacific relies on warrant judgment as a matter of law.

**B.    A new trial is not warranted in this case.**

Alternatively, Union Pacific argues that the Court should order a new trial.  To the extent that Union Pacific argues that the alleged errors regarding Lindon and Godwin warrant a new trial, the Court adopts its explanation from above regarding why those alleged errors have no merit.  As explained below, the remaining arguments Union Pacific advances do not warrant a new trial.

### 1.    Evidence related to the Dake Dam was properly excluded.

As its first argument to support the ordering of a new trial, Union Pacific claims that the Court erred by excluding evidence related to negligence that occurred at the Dake Dam.  Its theory relies on the premise that Winecup had a duty to decommission the Dake Dam.[3]  This issue was fully briefed and decided during trial.  *See* ECF Nos. 260, 262, & 263; Tr. at 1284–89.  After reviewing all the relevant evidence, the parties' briefing for this motion, and the briefing regarding the previous motion, the Court again holds that Winecup Gamble did not have a duty to decommission the Dake Dam and as a result cannot establish a causal connection between a breach of duty by Winecup related to the Dake Dam and Union Pacific's injuries.

---

[3] There was no evidence that there was any structural or spillway failure at the Dake Dam.

1    Relevant statutes and regulations pertaining to dams, compiled in Exhibits 3 and 4, do not

2  establish that Winecup Gamble had a duty to decommission the Dake Dam.  Those statutes and

3  regulations pertain to dam safety, not to a duty or obligation to decommission a dam.  Moreover,

4  they do not prohibit relative inactivity of the using the dam.  Union Pacific has not identified nor

5  has the Court found any law that requires the decommissioning of a dam.  Moreover, Union

6  Pacific's theory would essentially create strict liability for dam owners in remote unpopulated

7  areas that have a dam that continues to exist.  This type of liability does not find a home in the

8  statutes and regulations that Union Pacific relies on or any other Nevada law.  And, most

9  significantly, the jury's Act of Nature or Act of God verdict fundamentally moots Union Pacific's

10  negligence claim.

11    Because Union Pacific cannot establish a duty to decommission, it necessarily follows that

12  a causal connection cannot be established between Union Pacific's injuries at mile post 670 and

13  any negligent conduct by Winecup under Union Pacific's theory.  Accordingly, the evidence

14  pertaining to the Dake Dam was properly excluded.

15              2.    The Court properly denied Union Pacific's proposed missing witness and
16                    documents instruction.

17    Union Pacific claims that the Court erred by failing to give a missing witness and missing

18  documents instruction.  Under its theory, this instruction was warranted because Winecup Gamble

19  made an improper argument about the 1996 and 2003 inspection reports of the 23-Mile Dam that

20  was unsupported by witnesses within its control and documentation.  During the trial, Union

21  Pacific claimed that Winecup Gamble had done nothing in response to the inspection letters'

22  indication that there were deficiencies in the 23-Mile Dam.  Winecup Gamble refuted this claim

23  by referencing letters that Winecup Gamble sent to the state and by explaining that, as any

24  reasonable ranch manager would do, Winecup Gamble hired both a lawyer and an engineer after

25  receiving those reports.  Winecup Gamble reasonably believed that these facts demonstrated that

26  it had done at least something in response to the letters.  Further, it recognized that it is unknown

27  what happened in between the time those inspection reports were received and when the 2012 and

28  2016 inspection reports were provided lacking any indication that the dam's spillway was

1  undersized.   In arguing to the contrary, Union Pacific mischaracterizes Winecup Gamble's

2  argument by claiming that Winecup Gamble argued that the Department of Water Resources

3  withdrew the findings included in the 1996 and 2003 inspection reports.   Union Pacific has

4  identified no citations to support this argument, and the Court's review of the trial transcripts has

5  not produced any.   Winecup Gamble did not make an improper argument that warranted a missing

6  witness and documents instruction.   Moreover, the proposed instruction was not supported by a

7  model instruction or caselaw.

8         3.      <u>Union Pacific's miscellaneous arguments that were raised merely to avoid
                   waiver do not warrant a new trial.</u>
9

10       Union Pacific raises several arguments in its motion to avoid waiver.   *See* ECF No. 303 at

11  26–28.   It supports these arguments either by reference to previous briefing or by no argument at

12  all.   *See id.*

13       First, Union Pacific argues that the Court should have granted it judgment as a matter of

14  law during trial on its claims and on Winecup Gamble's affirmative defenses.   As explained during

15  trial, there were questions of fact that needed to be decided by the jury, and the jury needed to

16  make the determinations of credibility relating to the witnesses.   Evidence supported both Union

17  Pacific's and Winecup Gamble's positions.   Accordingly, judgment as a matter of law was not

18  warranted.

19       Second, Union Pacific claims that the Court erred in its determination of the proper

20  measure for damages.   ECF No. 303 at 27.   For the same reasons as explained in the Court's

21  previous orders, the proper measure of damages was the cost to replicate pre-flood culverts and

22  earthen embankments.   *See* ECF Nos. 203, 214.

23       Third, Union Pacific argues that the Court erred by denying its request to amend its

24  complaint to add a gross negligence claim.   The Court adopts by reference its previous ruling on

25  this issue and further notes that, even if a gross negligence claim were added, Union Pacific would

26  not have prevailed considering that the jury found that Union Pacific failed to prove its claim of

27  negligence.

28  ///

Fourth, Union Pacific asserts that the Court erred regarding six jury instruction rulings but fails to present any argument supporting its assertion. Upon review, the Court finds no error in these jury instruction rulings and adheres to its previous ruling.

Fifth, Union Pacific claims that the Court erred by not allowing it to use four exhibits during its rebuttal case. As explained at trial, these exhibits were cumulative, could have been presented in Union Pacific's case in chief, and did not rebut anything Winecup had offered during its presentation of its case. Accordingly, they were properly excluded.

Sixth, Union Pacific submits that the Court erred by allowing Winecup Gamble's counsel to provide lengthy, narrative objections that coached witnesses and impermissibly bolstered their credibility. The Court has thoroughly reviewed the trial transcripts and has not identified any objections meeting Union Pacific's description. Accordingly, the Court finds that this argument does not support a new trial.

****

In sum, the arguments that Union Pacific advances to support judgment as a matter of law in its favor or alternatively a new trial do not have merit. All expert testimony was properly admitted. Evidence regarding the Dake Dam was properly excluded. The Court did not err by refusing to give a missing witness and documents instruction. And none of Union Pacific's miscellaneous arguments raised to avoid waiver demonstrate any alleged error that would warrant a new trial. Accordingly, the Court denies Union Pacific's motion.

## IV.   CONCLUSION

IT IS THEREFORE ORDERED that Union Pacific's motion for judgment as a matter of law or alternatively for a new trial (ECF No. 303) is denied.

IT IS SO ORDERED.

DATED this 16th day of June, 2023.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

20